**TWO RIVERS TERMINAL, L.P., Plaintiff,**

v.

**CHEVRON USA, INC., Defendant.**

**No. Civ.A. 1:CV–97–1595.**

United States District Court, M.D. Pennsylvania.

March 27, 2000.

Kenneth L. Joel, Rhoads & Sinon, Charles E. Gutshall, Rhoads & Sinon, Harrisburg, PA, for Two Rivers Terminal, L.P., plaintiff.

John M. Armstrong, Gordon A. Einhorn, Schnader, Harrison, Segal & Lewis, Harrisburg, PA, Gordon A. Einhorn, John M. Armstrong, Schnader Harrison Segal & Lewis, Philadelphia, PA, John M. Armstrong, Schnader Harrison Segal & Lewis, Cherry Hill, NJ, Theodore F. Haussman, Jr., Schnader Harrison Segal & Lewis, Philadelphia, PA, for Chevron USA, Inc., defendant.

## MEMORANDUM

CALDWELL, District Judge.

### I. *Introduction.*

The plaintiff, Two Rivers Terminal, L.P., and the defendant, Chevron U.S.A., Inc. (CUSA), are litigating the responsibility for the cleanup of environmental contamination at a gasoline and fuel oil terminal near Duncannon, Pennsylvania.

The parties have made claims against each other under various federal and Pennsylvania environmental laws, as well as Pennsylvania common law. The plaintiff makes the following claims: (1) a claim under section 9607(a)(2) of the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA), 42 U.S.C. §§ 9601–9675; (2) a claim under section 6021.1305(c) of the Pennsylvania Storage Tank and Spill Prevention Act (the Tank Act), 35 P.S. §§ 6021.101–6021.2104 (Purdon & Purdon Supp.1999–2000); (3) claims under sections 6020.702, 6020.1101 and 6020.1115 of the Pennsylvania Hazardous Sites Cleanup Act (PaHSCA), 35 P.S. §§ 6020.101–6020.1305 (Purdon & Purdon Supp.1999–2000); (4) common-law indemnity; (5) common-law contribution; and (6) a claim under 42 U.S.C. § 6972(a)(1)(B), the Resource Conservation and Recovery Act of 1996 (RCRA), Pub.L. No. 94–580, 90 Stat. 2795 (codified in scattered sections of 42 U.S.C.).

The defendant has made the following claims: (1) a CERCLA claim under section 9607; (2) a common-law claim for breach of contract; (3) a claim under section 6020.701 of PaHSCA; (4) a claim for common-law contribution; (5) a claim for common-law indemnity; and (6) a claim under

section 6021.1310 under the Tank Act. The defendant has also alleged 37 affirmative defenses.

We are considering the following motions: (1) the plaintiff's motion for partial summary judgment on the issue of liability; (2) CUSA's motion for summary judgment on Two Rivers' claims; and (3) CUSA's motion for summary judgment on its Tank Act counterclaim.

We will examine the summary-judgment motions under the well-established standard. *See Showalter v. University of Pittsburgh Medical Center*, 190 F.3d 231, 234 (3d Cir.1999).

II. *Background.*

We provide a brief background here as to the parties and a history of the site while setting forth other facts in the sections that follow.

In or about 1960 or 1961, Chevron constructed and owned the Duncannon terminal near Duncannon, Pennsylvania. The terminal had six aboveground storage tanks (ASTs) and four underground storage tanks (USTs). One of the USTs was a transmix or slop tank. The terminal stored and distributed petroleum products, including gasoline, leaded gasoline, diesel fuel and fuel oils.

Chevron operated the Duncannon terminal as a petroleum storage and distribution center until 1985, ceasing those operations in that year. In 1986, it sold the facility to Cumberland Farms, Inc., along with all its other assets in the northeastern United States. Cumberland Farms never intended to operate or occupy the Duncannon terminal, never did so, and never stored petroleum products at the terminal. On October 21, 1991, after months of negotiation, Cumberland Farms sold the terminal to Two Rivers.[1] On December 4, 1991, Two Rivers accepted a delivery of fuel oil, and in December 1992, its only delivery of unleaded gasoline.

Tests have been performed at the terminal for environmental contamination. To make the sale to Cumberland Farms, CUSA contracted with ERM–Northeast, Inc. to perform a visual and olfactory review of the Duncannon terminal. ERM drilled four monitoring wells. In February 1986, it detected a hydrocarbon odor in water taken from MW–2 and in May 1986 it detected hydrocarbon odors in MW–2 and MW–4, but concluded that there was no evidence of hydrocarbon contamination in the soil or groundwater.

In December 1990, before buying the site, Two Rivers contracted with Benatec Associates to examine it. Benatec found hydrocarbon contamination of the soil and groundwater. In MW–4 excessive concentrations of the hydrocarbon benzene were found, along with detectable amounts of three other hydrocarbons, toluene, ethylbenzene, and p-xylene. (These four hydrocarbons are known together as the BTEX hydrocarbons, the most water soluble hydrocarbons and the ones that wash into the groundwater.)

Two Rivers had GeoServices, Ltd. examine the site again in October and November 1991, about one month after it had bought the property. This examination confirmed the presence of high levels of total petroleum hydrocarbons (TPH) and BTEX hydrocarbons in the soil and groundwater. The levels around the transmix tank indicated that a spill had occurred in that area.

There is evidence of a major gasoline spill at the site in 1973. One witness observed it coming out of the transmix tank and spreading to a pond about 75 yards away. There were several other releases of petroleum products at the Duncannon facility during Chevron's ownership and operation of it.

After Two Rivers became aware of contamination at the site, on July 29, 1992, it

1. There were a number of business entities associated from time to time with the purchase of the site, all connected to James A. Talley, a retail oil distributor who wanted to

buy the terminal. For simplicity's sake, we will refer only to Two Rivers, the ultimate purchaser of the terminal.

contacted the Department of Environmental Protection (EPA) and the Pennsylvania Department of Environmental Resources (PaDER) (now the Pennsylvania Department of Environmental Protection (PaDEP)). Since that time, no major cleanup has been ordered; the transmix tank and some soil have been removed, but for the most part, only monitoring of the site has occurred by the taking of soil and water samples to determine the extent of hydrocarbon pollution. Two Rivers has also considered "natural attenuation" as part of its solution to contamination at the site.

### III. *CUSA's Motion For Summary Judgment.*

#### A. *Two Rivers' Tank Act Claim.*

#### 1. *The Statute of Limitations.*

Contending that a two-year statute of limitations applies to a Tank Act claim, the defendant argues that Two Rivers' Tank Act claim is time barred. CUSA maintains that the plaintiff knew about its claim at the latest by October 31, 1991, the date the property was purchased, but did not file this suit until October 20, 1997, well in excess of the two-year period for pursuing this claim.

The Tank Act contains no explicit statute of limitations for a citizen suit under 35 P.S. § 6021.1305(c). In arguing for a two-year limitations period, CUSA points out that Pennsylvania has provided a two-year limitations period for a number of claims arising from injury to the person, personal property or real property, including a limitations period that appears to cover the statutory claim at bar: "[a]ny other action or proceeding to recover damages for injury to ... property which is founded on negligent, intentional, or otherwise tortious conduct or any other action or proceeding sounding in trespass...." 42 Pa.C.S. § 5524(7) (brackets added).[2]

CUSA also points to section 5524(4) which more specifically provides a two-year limitations period for "an action for waste or trespass of real property" and to the two-year statute of limitations for a cause of action for nuisance, citing *Dombrowski v. Gould Electronics, Inc.*, 954 F.Supp. 1006, 1013 (M.D.Pa.1996); and *Rohrbach v. AT & T Nassau Metals Corp.*, 888 F.Supp. 627, 632 (M.D.Pa.1994). It asserts that Two Rivers' citizen-suit claim under § 1305(a) can be identified as a statutory claim for nuisance since the Tank Act provides that "[a] violation of this act or of any order or regulation adopted by the department or of permits issued by the department shall constitute a public nuisance." 35 P.S. § 6021.1304. Based on the similarities between the common-law claims and the Tank Act claim, it thus argues that plaintiff's Tank Act citizen-suit claim is also subject to a two-year statute of limitations.[3]

**2.** The entire text of section 5524 reads as follows:

The following actions and proceedings must be commenced within two years:

(1) An action for assault, battery, false imprisonment, false arrest, malicious prosecution or malicious abuse of process.

(2) An action to recover damages for injuries to the person or for the death of an individual caused by the wrongful act or neglect or unlawful violence or negligence of another.

(3) An action for taking, detaining or injuring personal property, including actions for specific recovery thereof.

(4) An action for waste or trespass of real property.

(5) An action upon a statute for a civil penalty or forfeiture.

(6) An action against any officer of any government unit for the nonpayment of money or the nondelivery of property collected upon on execution or otherwise in his possession.

(7) Any other action or proceeding to recover damages for injury to person or property which is founded on negligent, intentional, or otherwise tortious conduct or any other action or proceeding sounding in trespass, including deceit or fraud, except an action or proceeding subject to another limitation specified in this subchapter.

**3.** As final support for this position, CUSA discusses the approach of a number of courts that have addressed the limitations issue for another Pennsylvania cause of action that has no explicit statute of limitations, a cause of action for the bad-faith handling of an insur-

In opposition, Two Rivers first argues that section 5524(7)'s two-year limitations period does not apply because CUSA likens Two Rivers' Tank Act claim to negligence, strict liability, nuisance or trespass claims. However, Two Rivers cannot sue CUSA under these common-law theories of relief because Two Rivers is the present owner of the Duncannon terminal and CUSA a former owner of the same property. Two Rivers cites in its support, among other cases, *Philadelphia Electric Co. v. Hercules, Inc.*, 762 F.2d 303, 313–15 (3d Cir.1985) (nuisance action only serves to resolve conflicts between neighboring and contemporaneous land uses); and *Andritz Sprout–Bauer, Inc. v. Beazer East, Inc.*, 174 F.R.D. 609 (M.D.Pa.1997) (owner of environmentally contaminated property cannot assert trespass claim against former owner). In Two Rivers' view, since these common-law tort theories do not apply to its case, it is improper to borrow the two-year statute of limitations applicable to them. Further, since Pennsylvania's tort-law causes of action under the common law do not adequately deal with the problems of petroleum contamination, as evidenced by Pennsylvania's statutory response to those problems, statutes of limitation governing those actions will not sufficiently protect those harmed by petroleum contamination either.

Second, Two Rivers points to *Buttzville Corp. v. Gulf Oil Corp.*, 25 Pa.D. & C. 4th 172, 1995 WL 808347 (1995), the only published opinion that discusses the limitations period for a Tank Act claim. *Buttzville Corp.* held that the 20–year statute of limitations in 35 P.S. § 6021.1314 (Purdon 1993) for PaDEP to initiate actions for civil or criminal penalties applies to a citizensuit under section 6021.1305(c).[4] The court reasoned that since the statute allowed PaDEP 20 years to seek civil or criminal penalties, it was "logical to assume that the General Assembly intended the 20 year limitation for the 'civil or criminal penalties' mentioned in section 6021.1314 to apply to private actions...." *Id.* at 176–77.

Four factors buttressed this reasoning. First, the Tank Act contained no other limitations period. Second, the General Assembly intended the Tank Act "to be liberally construed to fully protect the health, welfare and safety of Pennsylvania's residents." *Id.* at 177. Third, in *Centolanza v. Lehigh Valley Dairies Inc.*, 430 Pa.Super. 463, 635 A.2d 143 (1993), aff'd, 540 Pa. 398, 658 A.2d 336 (1995), the Pennsylvania Superior Court, in ruling that the corrective measures available to PaDEP (then PaDER) under the Tank Act were also available to private parties, signaled that private actions were not to be treated differently from agency actions. The common pleas court also stated:

> Finally, we find it nonsensical that the General Assembly intended that an action by the Commonwealth must be brought within a 20 year period but that a private action would be governed by the two year statute of limitations, which is provided in 42 Pa.C.S. § 5524(4) for actions for waste or trespass of real property, as the additional defendant

---

ance claim under 42 Pa.C.S. § 8371. Some courts have decided that because the claim sounds in tort, Pennsylvania's two-year tort statute of limitations in section 5524(7) should apply. *See e.g., Nelson v. State Farm Mutual Automobile Ins. Co.*, 988 F.Supp. 527 (E.D.Pa.1997). CUSA argues that we should likewise apply section 5524(7) here because the Tank Act claim is essentially a tort claim for injury to property.

We see no need to engage in an extensive discussion of the case law on the section 8371 cause of action, as CUSA has done, or to decide that CUSA is correct in its assumption that Pennsylvania courts look to analogous

causes of action to determine the appropriate limitations period. Two Rivers does not dispute CUSA's position that under Pennsylvania law, when no statute of limitations explicitly controls, courts should look to analogous causes of action to find the limitations period. It only quarrels with the conclusion CUSA reaches.

4. Section 6021.1314 reads as follows: "The provisions of any other statute to the contrary notwithstanding, actions for civil or criminal penalties under this act may be commenced at any time within a period of 20 years from the date the offense is discovered."

contends. We do not believe that a two year limitation for a private action under the STSPA would protect the health, welfare and safety of Pennsylvania's residents as fully as the General Assembly intended. For all these reasons, we conclude that the [Tank Act] provides a 20 year statute of limitations for a private action.

*Id.* at 177–78 (brackets added). *See also Schatz v. Laidlaw Transportation, Ltd.,* 1997 WL 186339 (E.D.Pa.1997) (dismissing tort claims as barred by the two-year statute of limitations but allowing Tank Act claim to proceed).

Third, Two Rivers argues that if section 6021.1314's 20–year limitations period does not apply, then there is no statute of limitations on its claim or, alternatively, the six-year catchall period in 42 Pa.C.S. § 5527 (Purdon Supp.1999–2000) applies.[5] In support, the plaintiff asserts that its Tank Act claim seeks both tort and contract damages—tort damages for the diminution in the property value of the Duncannon site and "contract-type damages for contribution and indemnification." (Two Rivers' omnibus memorandum at p. 26 n. 21). Two Rivers then points out that the routine tort claim has a two-year limitations period (citing section 5524), and an indemnity claim a four-year limitations period (citing 42 Pa.C.S. § 5525) but that a contribution claim has a six-year statute of limitations, citing section 5527's catchall provision and *Bednar v. Bednar,* 455 Pa.Super. 487, 688 A.2d 1200 (1997) (action for contribution in a real-estate partition action is governed by a six-year statute of limitations).

In reply, CUSA contends that Two Rivers' first argument is a non sequitur, that simply because Two Rivers could not have sued under common-law causes of action does not mean that the Tank Act claim cannot be treated like those actions and thus subject to their statute of limitations.

Next, it argues that *Buttzville* was erroneously decided for the following reasons. First, contrary to Pennsylvania law on the interpretation of statutes, the court added words to the statute, citing in part, *Altieri v. Allentown Officers' and Employees' Retirement Board,* 368 Pa. 176, 181, 81 A.2d 884, 886 (1951) ("What the legislature failed to include, a court may not add"); and *Key Savings and Loan Ass'n v. Louis John, Inc.,* 379 Pa.Super. 226, 232, 549 A.2d 988, 991 (1988) ("this Court is without authority to insert a word into a statutory provision where the legislature has failed to supply it"). CUSA maintains that the court improperly re-wrote the statute to add a 20–year limitations period for citizen suits that is not present in the statutory language.

Second, CUSA asserts that the General Assembly, by failing to include citizen suits in section 6021.1314's 20–year limitations period, clearly intended that this lengthy period not apply to Tank Act citizen suits. CUSA points to the analogous provision in PaHSCA, enacted about a year before the Tank Act, which explicitly provides a 20–year statute of limitations not only for civil and criminal penalties but also for civil actions under PaHSCA as well. The PaHSCA provision states, in pertinent part:

> Notwithstanding the provisions of any other statute to the contrary, actions for civil or criminal penalties under this act or civil actions for releases of hazardous substances may be commenced at any time within a period of 20 years from the date the unlawful conduct or release is discovered.

35 P.S. § 6020.1114 (Purdon 1993).

CUSA contends that the absence of the clause "or civil actions for releases of hazardous substances" in the Tank Act counterpart to this PaHSCA section establishes the General Assembly's intent that a Tank

---

5. Section 5527 reads as follows:

Any civil action or proceeding which is neither subject to another limitation specified in this subchapter nor excluded from

the application of a period of limitation by section 5531 (relating to no limitation) must be commenced within six years.

Act civil action is not governed by the 20–year limitations period in section 6021.1314.

CUSA also attacks the *Buttzville* conclusion that it would be "nonsensical" to subject a private cause of action to a two-year period of limitations while allowing a governmental action a 20–year period. CUSA points out that the Commonwealth is often not subject to a limitations period at all unless specifically made so by legislation, *see City of Philadelphia v. Lead Industries Ass'n, Inc.*, 994 F.2d 112, 118 (3d Cir.1993), and that even under the Tank Act, PaDEP can bring certain actions at any time to abate a nuisance, 35 P.S. § 6021.1305(a) (Purdon 1993), or to enjoin violations of the Act, *id.* at section 1305(b), while only actions for civil penalties under 35 P.S. § 6021.1307 (Purdon 1993), and for criminal penalties under 35 P.S. § 6021.1306 (Purdon 1993), are subject to the 20–year limitations period.

CUSA also contends that Two Rivers' argument that no limitations period should apply ignores section 5524(7) which imposes a two-year limitations period on tort-based claims. CUSA asserts that Two Rivers' citizen-suit cause of action is such a claim because it seeks damages for the diminution of the site's value, a claim that CUSA contends sounds in tort. Among other things, CUSA also points out that the Pennsylvania Superior Court's description of a Tank Act violation in *Centolanza, supra*, 430 Pa.Super. at 478, 635 A.2d at 150, as evidence of negligence per se provides further support for calling it a tort remedy. Finally, CUSA argues that a Tank Act claim cannot be one for indemnity since indemnity claims become ripe only when one party has been required to pay money to a third party, citing *Rubin Quinn Moss Heaney & Patterson, P.C. v. Kennel*, 832 F.Supp. 922, 935 (E.D.Pa. 1993).

■ We agree with the defendant's position that a private Tank Act claim is essentially a tort. To begin with, the Tank Act's citizen-suit provision authorizes what can best be described as a tort claim akin to a common-law claim for nuisance; the Tank Act recognizes that a violation of the Act can be abated as a nuisance. *See* 35 P.S. § 6021.1305(a). Additionally, the factual underpinnings of a private claim under section 1305(c) (here a release of petroleum products into the land and water) are the equivalent of a common law cause of action for nuisance without the common-law limitations. *See Philadelphia Electric Co., supra.* In fact, a common-law cause of action for nuisance is a tort. *Golen v. Union Corp.*, 718 A.2d 298, 300 (Pa.Super.1998). Further, under the Pennsylvania Supreme Court's interpretation of the citizen-suit provision, a person injured by a violation of the Act can recover as damages the "costs of cleanup and diminution in property value." *Centolanza, supra*, 540 Pa. at 407, 658 A.2d at 340. At least the latter element of damages is recoverable under the common law of nuisance, *see Golen, supra*, 718 A.2d at 300, and probably the first as well. 28 P.L.E. § 48 n. 49 (1960).

■ Since section 6021.1305(c)'s private cause of action is a tort, we must look to 42 Pa.C.S. § 5524(7) for its statute of limitations. As noted, section 5524(7) provides a two-year statute of limitations for "[a]ny other action or proceeding to recover damages for injury to person or property which is founded on negligent, intentional, or otherwise tortious conduct or any other action or proceeding sounding in trespass. . . ." A private action under section 6021.1305(c) fits this description. Hence, a two-year period of limitations applies to a private Tank Act claim.

There is thus no need to rely on broad policy considerations or logical assumptions, as the *Buttzville* court did, in finding the appropriate limitations period. Pennsylvania law tells us what limitations period applies. We thus respectfully disagree with *Buttzville*'s approach to the issue.

We also reject the plaintiff's position that the six-year catchall limitations period in section 5527 applies. To make this argument, Two Rivers asserts that its claim

for contribution seeks contract damages. However, it cites no authority for this proposition and does not argue that CUSA contractually agreed to provide contribution. We therefore reject this position.

Having concluded that a two-year limitations period applies, we must decide if Two Rivers' Tank Act claim is time barred. CUSA asserts that at the latest Two Rivers' principals knew about the contamination at the Duncannon terminal by October 21, 1991, the date Two Rivers executed the contract to buy the terminal. Since this lawsuit was filed on October 20, 1997, well in excess of two years after the purchase, the Tank Act claim is time barred.

Two Rivers does not argue with these facts, and we agree with CUSA. As noted above, Two Rivers and Cumberland Farms negotiated over a number of months about the contamination at the site before the sale was made. In fact, in December 1990, Two Rivers contracted with Benatec Associates to examine the site for pollution. Two Rivers thus knew about the contamination if not its extent by October 21, 1991. Hence, its Tank Act claim is time barred.

Two Rivers argues that, if its Tank Act claim is barred by a two-year statute of limitations, then CUSA's Tank Act counterclaim is time barred as well. It points out that it had put CUSA on notice of a potential Tank Act claim in 1991 when Two Rivers told CUSA it was looking to it to remediate the site, but the counterclaim was not filed until January 1999, well in excess of two years later.

We agree with Two Rivers that CUSA's Tank Act claim is time barred too, although we believe a later date provides a stronger basis for starting the limitations period. In December 1995, Worldwide Geosciences tested a water sample for Land Tech, CUSA's environmental consul-

tant. The sample was described as consisting of high-lead gasoline typically made before July 1985, but also of diesel fuel or "fuel oil derived hydrocarbons" that was "minimally biodegraded" and most probably with "an exposure time of less than seven years." This calculation places a potential diesel-fuel release at the site after CUSA left, as CUSA itself has argued. A counterclaim filed in January 1999 is thus well beyond the two-year limitations period. Hence, CUSA's Tank Act claim is time barred.[6]

### 2. *Retroactivity of the Tank Act.*

CUSA also argues that Two Rivers' Tank Act claim fails because it attempts to reach conduct that occurred before the Act became effective and the Tank Act cannot be applied retroactively. CUSA ceased operations at the terminal in 1985 and sold it in 1986. The Tank Act became effective on August 6, 1989.

CUSA relies on the statutory language that allows a private cause of action when a defendant is *"in violation* of any provision of this act or any rule, regulation, order or permit issued pursuant to this act." 35 P.S. § 6021.1305(c) (emphasis added). It then argues:

> Two Rivers cannot make that showing as a matter of law for the simple reason that CUSA cannot be "in violation of" a provision or rule under the Tank Act when it severed all interest in the Property over three years before there was any provision or rule to violate.

(CUSA's summary-judgment brief on Two Rivers' claims at p. 16–17).

To buttress this argument, CUSA cites cases analyzing similar statutory language in federal law and the law of other states. It starts with RCRA, whose citizen-suit

---

**6.** Thus we do not have to resolve the issues raised in CUSA's motion for summary judgment on its Tank Act claim. We do note, however, that we agree with CUSA that its monetary expenditures in monitoring the site would have been a sufficient interest to allow

it to sue under the Tank Act's citizen-suit provision, 35 P.S. § 6021.1305(c), given the state supreme court's liberal interpretation of that provision in *Centolanza v. Lehigh Valley Dairies, Inc.*, 540 Pa. 398, 658 A.2d 336 (1995).

provision also contains the "in violation" language as follows:

[A]ny person may commence a civil action on his own behalf—

(1)(A) against any person ... who is alleged to be in violation of any permit, standard, regulation, condition, requirement, prohibition, or order which has become effective pursuant to this chapter ...

42 U.S.C. § 6972(a)(1)(A). The "in violation" language has led to rulings that RCRA does not apply to conduct occurring before RCRA's enactment. *See Ascon Properties, Inc. v. Mobil Oil Co.,* 866 F.2d 1149, 1158–59 (9th Cir.1989) (citing *Gwaltney of Smithfield v. Chesapeake Bay Foundation, Inc.,* 484 U.S. 49, 108 S.Ct. 376, 98 L.Ed.2d 306 (1987)); *Pennsylvania Real Estate Investment Trust v. SPS Technologies, Inc.,* 1995 WL 687003 (E.D.Pa.1995); *Petropoulos v. Columbia Gas,* 840 F.Supp. 511, 514–15 (S.D.Ohio 1993). As *Ascon Properties* reasoned:

Ascon's second amended complaint alleged that Mobil's disposal ceased in 1972. RCRA was not enacted until 1976. Therefore, Mobil simply could not have been "in violation of any permit, standard, regulation, condition, requirement, prohibition, or order which has become effective pursuant to this chapter," 42 U.S.C. § 6972(a)(1)(A): there was no statute pursuant to which such a permit could have been effective at the time of Mobil's alleged acts.

866 F.2d at 1159. The defendant also cites *Louisiana–Pacific Corp. v. ASARCO Inc.,* 24 F.3d 1565, 1578–79 (9th Cir.1994), in which the Ninth Circuit relied on *Ascon Properties* to preclude retroactive application of a Washington State environmental law that contained an analogous provision to RCRA's citizen-suit section.

Additionally, CUSA points out that Pennsylvania does not permit retroactive application of a statute unless the General Assembly clearly and manifestly intends it. *See* 1 Pa.C.S. § 1926; *Gehris v. Commonwealth, Department of Transportation,* 471 Pa. 210, 214, 369 A.2d 1271, 1273 (1977)

("absent clear language to the contrary, statutes are to be construed to operate prospectively only"). It contends there is no language in the Tank Act specifying it should be applied retroactively. Hence, it cannot be applied here to CUSA's conduct before enactment.

The plaintiff counters by first arguing that the Tank Act is retroactive because it defines an "owner" of a UST, in part, as an owner of such tanks from a date before the Act's 1989 effective date:

the owner of an underground storage tank holding regulated substances on or after November 8, 1984, and the owner of an underground storage tank at the time all regulated substances were removed when removal occurred prior to November 8, 1984.

35 P.S. § 6021.103 (Purdon Supp.1999–2000). The plaintiff thus argues that the Act must have been intended to reach into the past.

Two Rivers also argues that Pennsylvania has already construed the Tank Act as applying to conduct before its enactment. It relies on the supreme court's decision in *Centolanza, supra,* 540 Pa. 398, 401, 658 A.2d 336, 337 (1995), and *Juniata Valley Bank v. Martin Oil Co.,* 736 A.2d 650 (Pa.Super.1999), both of which applied the Tank Act to pre-Act contamination. The plaintiff also cites *Delaware Coca–Cola Bottling Company, Inc. v. S & W Petroleum Service, Inc.,* 894 F.Supp. 862, 865 (M.D.Pa.1995) (McClure, J.), which also applied the Act to pre-Act releases by reasoning that the Tank Act has no retroactive effect. *Delaware Coca–Cola* looked to the contaminated condition of the property, a condition that continued after the Tank Act's effective date, rather than to a release that may have occurred before then.

Finally, Two Rivers argues as a matter of public policy that the Tank Act should apply to pre-Act releases. In its view, citing *Centolanza, supra,* 540 Pa. at 406, 658 A.2d at 340, since the Act is a remedial statute intended to preserve the health

and safety of Pennsylvania's citizens, it should be liberally construed to cover CUSA's releases.

Borrowing the reasoning of those cases interpreting the RCRA. citizen-suit provision, we agree with CUSA that the Tank Act does not reach conduct occurring before its effective date. As the court in *Pennsylvania Real Estate, supra,* concluded: "In essence, there can be no continuing violation of RCRA when there was no violation of RCRA to begin with." 1995 WL 687003 at *7. Similarly, there can be no violation of the Tank Act when there was no Tank Act.

We reject the plaintiff's reliance on the definition of an owner. As the the defendant argues, the relevant language is that of section 6021.1305(c), authorizing private actions against those "in violation" of the Act. The Tank Act's definitional section merely defines who may be an owner for the purpose of the Act.

We also reject its reading of *Centolanza, supra,* 540 Pa. 398, 401, 658 A.2d 336, 337 (1995), and *Juniata Valley Bank, supra,* as approving the application of the Tank Act to pre-Act contamination. These cases did apply the Tank Act to such contamination but, as CUSA argues, the retroactivity issue was not raised in them. Hence, they cannot be cited as authority for the proposition that the Tank Act reaches pre-Act releases or pollution. We also disagree with *Delaware Coca–Cola Bottling Company, supra.* It is not the continued pollution that triggers the private-party cause of action; it is the violation of the Act.

■ Finally, we reject Two Rivers' public-policy argument. We cannot ignore the language of the statute under the guise of enforcing its overall purpose. *See Bissette v. Colonial Mortgage Corp.,* 477 F.2d 1245, 1247 (D.C.Cir.1973). In any event, in *Centolanza,* the court was interpreting remedial language that was ambiguous. We find no ambiguity in the private-suit provision.

Thus, in addition to the statute of limitations, the plaintiff's Tank Act claim lacks merit because the Tank Act does not apply to conduct occurring before its enactment.

**B.** *Two Rivers' CERCLA and PaHSCA Claims.*

CUSA moves for summary judgment on Two Rivers' CERCLA and PaHSCA claims on the ground that there is, no evidence of a release or a threatened release of a "hazardous substance," as defined in both Acts, citing *ABB Industrial Systems, Inc. v. Prime Technology, Inc.,* 120 F.3d 351, 356 (2d Cir.1997); and *Darbouze v. Chevron Corp.,* 1998 WL 512941 (E.D.Pa.).

CERCLA covers a number of hazardous substances, as defined in 42 U.S.C. § 9601(14). The definition, however, expressly excludes "petroleum, including crude oil or any fraction thereof ..." *Id.* PaHSCA "is Pennsylvania's version of CERCLA and was in fact modeled after the federal statute." *Darbouze, supra,* 1998 WL 512941 at *9 (citing *General Electric Environmental Services, Inc. v. Envirotech Corp.,* 763 F.Supp. 113, 115 n. 1 (M.D.Pa.1991)). PaHSCA also excludes from its definition of "hazardous substance" "petroleum or petroleum products, including crude oil or any fraction thereof ..." 35 P.S. § 6020.103. And courts will often follow CERCLA in interpreting PaHSCA. *Darbouze, supra; General Electric, supra.*

■ The petroleum exclusion includes fuel oil and leaded gasoline, *Wilshire Westwood Associates v. Atlantic Richfield Corp.,* 881 F.2d 801, 803, 810 (9th Cir. 1989); *Andritz Sprout–Bauer, Inc. v. Beazer East Inc.,* 12 F.Supp.2d 391, 410 (M.D.Pa.1998) (gasoline), and any indigenous components in refined or unrefined gasoline or any such components added in the refining process even if the components would by themselves be considered hazardous substances. *United States v. Alcan Aluminum Corp.,* 964 F.2d 252, 266–67 (3d Cir.1992); *Wilshire,* 881 F.2d at 810.

In support of its motion, CUSA argues that the only evidence of a release or threat of release was of petroleum products and that the only "hazardous substances" that have been discovered at the terminal are the natural constituents of the petroleum products that were stored there. CUSA thus argues that Two Rivers' CERCLA and PaHSCA claims are meritless.

In opposition, Two Rivers argues that some of the pollution may have come from leaks from the USTs over the some 25 years that CUSA operated the terminal rather than from spills. Citing *Mid Valley Bank v. North Valley Bank,* 764 F.Supp. 1377 (E.D.Cal.1991), the plaintiff asserts that leaks of petroleum products from storage tanks do not come within the petroleum exclusion and summary judgment is thus precluded. Two Rivers may also be arguing, based on a supplemental affidavit from its environmental consultant, that some unnamed, nonpetroleum-type "contaminant" is present at the site.

We reject Two Rivers' position. First, the record establishes that the only products stored at the terminal were gasoline and fuel oil and that the only contaminants were constituents of these products, not some unnamed contaminant. The plaintiff has to establish the presence of its unnamed contaminant before it can defeat summary judgment on this basis.

Second, Two Rivers has misread *Mid Valley Bank.* That case turned on the fact that the petroleum products had been adulterated, not with whether they had leaked from tanks. The court decided that adulterated petroleum did not come within the petroleum exclusion. Here, the petroleum products were not adulterated, and *Mid Valley Bank* is not relevant.

We will therefore grant summary judgment in CUSA's favor on Two Rivers' CERCLA and PaHSCA claims. Since CUSA has agreed to withdraw its own CERCLA and PaHSCA claims, if we grant it summary judgment on Two Rivers' claims, we will also dismiss CUSA's CERCLA and PaHSCA claims.

### C. *Two Rivers' RCRA Claim.*

Two Rivers' RCRA claim is under 42 U.S.C. § 6972(a)(1)(B), which requires the plaintiff to show there is "solid or hazardous waste which may present an imminent and substantial endangerment to health or the environment...." The section authorizes a plaintiff to seek an injunction requiring the responsible party to clean up the site. *Meghrig v. KFC Western, Inc.,* 516 U.S. 479, 116 S.Ct. 1251, 134 L.Ed.2d 121 (1996).

CUSA moves for summary judgment on this claim by contending that the plaintiff has not shown an imminent and substantial endangerment.

In *Meghrig,* the Supreme Court stated that "[a]n endangerment can only be 'imminent' if it 'threaten[s] to occur immediately,' ... and the reference to waste which 'may present' imminent harm quite clearly excludes waste that no longer presents such a danger." *Id.* at 485–86, 116 S.Ct. at 1255, 134 L.Ed.2d at 128. "[T]here must be a threat which is present now, although the impact of the threat may not be felt until later." *Id.* at 486, 116 S.Ct. at 1255, 134 L.Ed.2d at 128 (quoting *Price v. United States Navy,* 39 F.3d 1011, 1019 (9th Cir.1994)).

In addition, the imminent-and-substantial-endangerment language implies as a whole that there must be some necessity for the action requested by the plaintiff. *Price,* 39 F.3d at 1019; *Foster v. United States,* 922 F.Supp. 642, 661 (D.D.C.1996).

In support of its motion, CUSA maintains that there is no evidence of an imminent endangerment at the Duncannon Terminal. The defendant begins with the site's cleanup history. The site was not subject to any PaDEP cleanup order, just a requirement over the years, beginning in 1992, to monitor the soil and water, (although the transmix tank and some contaminated soil were removed in August 1994). In May 1997, Two Rivers' environmental consultant raised the possibility of

an "Act 2 closure" and obtaining a "no further action" release from the Commonwealth. (CUSA's Ex. 30).[7] The consultant also mentioned "natural attenuation" as taking care of the remaining contamination. In October 1998, the same consultant also wrote to Two Rivers' insurance agent that "although concentrations of some compounds remain above the [DEP] cleanup levels, the concentrations of individual compounds have decreased. In addition, the latest sampling shows that in the most downgradient well (MW–15), only napthalene exceeds a cleanup level." (CUSA's exhibit 48). As CUSA argues, this history belies Two Rivers' contention that the site presents an imminent and substantial threat to persons or the environment.

CUSA also relies on an August 1997 "Solute Transport Evaluation" study performed by CUSA's environmental consultant, Land Tech Remedial, Inc. The study evaluated the terminal's risk to persons and the environment. It concluded there was no risk from the drinking water on site because the high iron content of the groundwater had made it unusable for drinking anyway. (Exhibit 31 at CUSA 8069). Additionally, there was no risk to drinking water off-site because the groundwater flow is to the west and southwest toward the Juniata River, and drinking wells were on farms to the north and south. *Id.*

Land Tech also evaluated the danger to the Juniata River, about 600 feet west of the site. It employed a "highly conservative model" ("conservative" in the sense of protecting health and the environment) by assuming the BTEX sources would be constant and continuous. It concluded that the Juniata River would have the following exposure from migrating BTEX compounds: benzine, 4ug/L; toluene, 5.5 ug/L; ethylbenzene, 50 ug/L; xylenes, 18 ug/L. *Id.* at 8072. It then opined that there would be no significant risk to the Juniata River because acceptable levels of these

compounds were: benzene, 5 ug/L; toluene, 1,000 ug/L; ethylbenzene, 700 ug/L; and xylenes, 10,000 ug/L.

The plaintiff counters that it need not "show an actual, present or immediate catastrophic harm to maintain its RCRA claim. In fact, Two Rivers need only show that there may be a threat of future harm," (opposition brief at pps. 31–32), citing in part, *Kara Holding Corp. v. Getty Petroleum Marketing, Inc.*, 67 F.Supp.2d 302 (S.D.N.Y.1999). It adds that "soil and groundwater pollution constitute, by definition, 'imminent and substantial endangerment.'" (*Id.* at p. 32). It also disputes CUSA's reliance on *Meghrig, supra*, arguing that the Supreme Court's discussion of the imminent-and-substantial-endangerment standard was dictum since the case dealt with whether past response costs could be recovered under RCRA, not with what had to be proven to compel another party to clean up a site.

Two Rivers also relies on the opinion of its environmental consultant. First, the consultant opines that because there is a water supply on the site, PaDEP deems the supply usable and hence drinking it could harm a person. Second, in the consultant's view, "imminent means "there is a threat of harm, although the impact of this threat may not be known until later" and "substantial endangerment" means a potential for harm to the environment or people." (Robelen supplemental affidavit, exhibit D, Two Rivers' supplemental appendix to CSMF–I). Based on these definitions, the consultant believes that the current contamination is an imminent and substantial endangerment. Third, the consultant challenges the conclusion that the Juniata River will not be harmed based on his belief that there is "insufficient data ... to make this conclusion." (*Id.*) "Since groundwater flows toward the river, it is possible that the river may be harmed in the future." (*Id.*)

---

7. Act 2 is the Land Recycling and Environmental Remediation Standards Act. 35 P.S. §§ 6026.101–6026.908 (Purdon Supp.1999–2000).

We agree with the defendant's position. As CUSA accurately described it, there is contamination on the site, but it poses no danger of imminent harm. In Meghrig, the Supreme Court stated that waste that no longer presents a danger does not satisfy the imminent-and-substantial-endangerment requirement. *Meghrig, supra,* 516 U.S. at 485–86, 116 S.Ct. at 1255, 134 L.Ed.2d at 128. ("the reference to waste which 'may present' imminent harm quite clearly excludes waste that no longer presents such a danger").

*Meghrig* 's standard was not dictum, as the plaintiff contends, but an important part of the resolution of that case. The factual issue was different from the one in the instant case, but the Court's explication of the imminent-and-substantial-endangerment requirement was important to the issue it had to decide there, whether a RCRA plaintiff could recover for past remediation costs. Thus, we can look to its expression of the requirement.

▮ *Meghrig* indicates that the plaintiff's position is incorrect in requiring only a showing that there may be a threat of future harm and in asserting that soil and groundwater pollution by itself constitutes imminent and substantial endangerment. Consistent with *Meghrig* 's approach, and in line with the statutory language, other courts have required more than just pollution; there has to be the potential for an imminent threat of substantial endangerment. *See Leister v. Black & Decker (U.S.) Inc.,* 1997 WL 378046 (4th Cir.1997); *Birch Corp. v. Nevada Investment Holding, Inc.,* 1998 WL 442982 (9th Cir.1998) (free floating underground gasoline at the site did not satisfy section 6972(a)(1)(B) requirement because there were no facts indicating that the water was otherwise usable or that the pollution would spread and the plaintiff's own recommendation was to allow passive remediation).

We do not accept Two Rivers' argument concerning the water supply. PaDEP may consider the water drinkable, but we must consider federal law, not state law, on this RCRA issue. The fact that no one is drinking this water eliminates it as a threat to health or the environment. *See Birch Corp., supra,* 1998 WL 442982 at *2 (no threat of imminent harm when the plaintiff "presents no evidence of any plans for subsurface excavation or for use of the ground water"); *Davies v. National Cooperative Refinery Ass'n,* 963 F.Supp. 990, 999 (D.Kan.1997); *Foster, supra,* 922 F.Supp. at 662.

We note that the plaintiff's cases are distinguishable. In *Kara Holding Corp., supra,* past leaks from a gasoline station were causing evacuations from the plaintiff's nearby building. In *Paper Recycling, Inc. v. Amoco Oil Co.,* 856 F.Supp. 671 (N.D.Ga.1993), 5,000 to 21,000 gallons of freestanding diesel fuel remained in the water table without any evidence of its risk to to persons or the environment. In *Buggsi, Inc. v. Chevron U.S.A., Inc.,* 857 F.Supp. 1427 (D.Or.1994), expert reports indicated that contamination from an adjoining petroleum terminal, although in the past, was causing recent releases in the soil near the plaintiff's property.[8]

Finally, Two Rivers' consultant's affidavit has not created a material dispute of fact concerning imminent-and-substantial endangerment. We have already rejected one of his contentions, that the mere presence of contaminants creates such a situation. We cannot accept his remaining assertion, that the Juniata River may yet be harmed because there is "insufficient data . . . to make the conclusion" that it will not.

The Land Tech report provided sufficient detail on the conclusion that the site

---

8. After briefing of the motions, the plaintiff submitted *Raymond K. Hoxsie Real Estate Trust v. Exxon Education Foundation,* 81 F.Supp.2d 359 (D.R.I.2000), to support its contention that it need only show contamination in excess of state environmental standards. *Hoxsie* does support this position, but there were other facts in that case that distinguish it from the instant one. In *Hoxsie,* the pollution was migrating unchecked in the groundwater in a residential neighborhood, thereby threatening people.

presented no imminent threat to the Juniata River. In reply, the plaintiff's consultant conclusionally opined that there was insufficient data to decide that question. This is not enough. *See Shaw v. Strackhouse,* 920 F.2d 1135, 1144 (3d Cir.1990) (expert affidavits that are conclusory and lacking in specific facts, are insufficient to create a genuine issue of material fact).

We will enter summary judgment in CUSA's favor on the RCRA claim. "While there can be no question that the levels of contamination present at the Site may warrant future response action, the plaintiff cannot establish either a current risk of 'substantial or serious' threatened harm, or 'some necessity for action.'" *Foster, supra,* 922 F.Supp. at 662 (quoting *Price, supra,* 39 F.3d at 1019).

> D. *Caveat Emptor and Two Rivers' Contribution and Indemnity Claims.*

CUSA argues that the doctrine of caveat emptor bars Two Rivers' common-law contribution and indemnity claims because Two Rivers purchased the site knowing that it had environmental problems.

Two Rivers' indemnity claim alleges that the plaintiff "has incurred and continues to incur damages in the form of response costs and attorneys fees to assess, evaluate, remediate, monitor and clean-up the Property." (Complaint, ¶ 57). It also alleges that CUSA was "the active and primary cause of the environmental contamination" (*id.,* ¶ 59) and hence should indemnify Two Rivers under the common law for its damages.

Two Rivers' contribution claim alleges that if Two Rivers is liable for environmental contamination at the site, then it is entitled to contribution from CUSA for expenses that exceed Two Rivers' "equitable share of liability or responsibility ..." (*Id.,* ¶ 62). The plaintiff invokes the Pennsylvania Uniform Contribution Among Tort-feasors Act, 42 Pa.C.S. §§ 8321–8327, and the common law.

"Under Pennsylvania law, the right to indemnity 'enures to a person who,

without active fault on his own part, has been compelled, by reason of some legal obligation to pay damages occasioned by the negligence of another.' *Burbage v. Boiler Engineering & Supply Company,* 433 Pa. 319, 326, 249 A.2d 563, 567 (1969)." *Philadelphia Electric Co. v. Hercules, Inc.,* 762 F.2d 303, 316 (3d Cir.1985). It is an equitable remedy that allows one who is secondarily liable to recover against one who is primarily liable. *Id.* at 318.

The main support for CUSA's position is *Philadelphia Electric.* The defendant also cites *Jones v. Texaco, Inc.,* 945 F.Supp. 1037, 1044–48 (S.D.Tex.1996); *Wellesley Hills Realty Trust v. Mobil Oil Corp.,* 747 F.Supp. 93, 99–101 (D.Mass.1990); and *PBS Coals, Inc. v. Burnham Coal Co.,* 384 Pa.Super. 323, 558 A.2d 562 (1989).

In opposition, Two Rivers asserts that *Philadelphia Electric* is distinguishable because that case refused to allow the current owner of a contaminated property to sue a prior owner under a nuisance cause of action, reasoning that the action was barred by caveat emptor. The plaintiff contends that the case did not deal with indemnity or contribution actions and therefore is not relevant here.

We agree with the plaintiff. In *Philadelphia Electric,* the court held that a nuisance claim was barred by caveat emptor, concluding as follows:

> Where, as here, the rule of *caveat emptor* applies, allowing a vendee a cause of action for private nuisance for conditions existing on the land transferred—where there has been no fraudulent concealment—would in effect negate the market's allocations of resources and risks, and subject vendors who may have originally sold their land at appropriately discounted prices to unbargained-for liability to remote vendees.

*Id.* at 314–15.

This reasoning does not apply to causes of action for indemnity or contribution, as *Philadelphia Electric* also makes clear.

In that case, the plaintiff argued on appeal that, in the alternative, the defendant should be liable under a theory of indemnity because the plaintiff had been compelled to pay cleanup costs under Pennsylvania's Clean Streams Law. If caveat emptor also applied to that cause of action, we see no reason why the Third Circuit would not simply have applied it to that theory as well. Instead, it examined the indemnity claim on the merits and concluded that it could not be successful for the following reasons.

First, the plaintiff had not proven at trial that it had been legally liable for the debt it sought to impose on the defendant, such legal liability being an essential element of an indemnity claim. *Id.* at 317.

Second, even if the plaintiff had proved that it had been required to pay the defendant's debt, it also failed on another essential element of an indemnity action. It could not show that the defendant was primarily liable for the contamination while it was only secondarily liable. Under the circumstances, which we will not detail, both the plaintiff and the defendant were only vicariously liable. Hence, the plaintiff in *Philadelphia Electric* could not equitably compel the defendant to indemnify it, indemnity being an equitable remedy. Here, in contrast, Two Rivers alleges that CUSA was the active and primary wrongdoer and that Two Rivers did not pollute the site.

The first two cases cited by the defendant are also distinguishable because they held that caveat emptor barred claims other than one based on indemnity. In *Jones,* it was negligence, gross negligence and strict liability. In *Wellesley Hills Realty Trust,* it was negligence claims. As to the last case, *PBS Coals, Inc.,* it did not deal with caveat emptor at all. It was a contract-interpretation case.

Our reasoning also applies to Two Rivers' contribution cause of action. We will therefore deny the motion for summary judgment based on caveat emptor as against the indemnity and contribution claims.

## IV. Two Rivers' Motion For Summary Judgment.

### A. Two Rivers' Tank Act Claim.

Two Rivers has moved for summary judgment on its Tank Act claim. We need not deal with this aspect of its motion. We already decided above that its Tank Act claim is barred because of the two-year statute of limitations in 42 Pa.C.S. § 5524(7) and also because the claim would be a retroactive application of the Act. (Otherwise, we note *Centolanza v. Lehigh Valley Dairies Inc.,* 540 Pa. 398, 658 A.2d 336 (1995), would authorize suit under the Tank Act.)

### B. CUSA's CERCLA and PaHSCA Claims.

Two Rivers has moved for summary judgment on CUSA's CERCLA and PaHSCA claims. CUSA agreed to withdraw its CERCLA and PaHSCA claims if we decided to grant it summary judgment on Two Rivers' CERCLA and PaHSCA claims. As discussed above, we concluded that CUSA was entitled to summary judgment on Two Rivers' CERCLA and PaHSCA claims and that we would dismiss CUSA's claims. Therefore, we need not discuss this aspect of Two Rivers' motion.

### C. CUSA's Contract Claim.

Two Rivers has moved for summary judgment on CUSA's twenty-sixth affirmative defense and second counterclaim. The defense and counterclaim assert that Two Rivers is responsible for cleaning up any contamination at the site because when Two Rivers bought the property, it contractually agreed with Cumberland Farms to be responsible for all remediation.

### Background

For the purposes of this part of the plaintiff's motion, the following background is sufficient. Chevron owned and operated the Duncannon Terminal in Dauphin County. In 1986, Chevron sold the property to Cumberland Farms, Inc.

A provision in the purchase contract allowed Cumberland Farms one year to raise any environmental concerns regarding the property and after that Cumberland Farms would be responsible for any environmental problems discovered. Cumberland Farms never reported any environmental contamination or raised any concerns during the one-year period.

On October 21, 1991, by a written agreement of sale, Two Rivers bought the Duncannon terminal from Cumberland Farms. The agreement referred to Cumberland Farms as the seller and Two Rivers as the buyer. CUSA was not mentioned. Paragraph 1 listed the purchase price as $700,000. Paragraph 12 set forth Two Rivers' acknowledgment that it was purchasing the property in an "as is" condition and indemnifying Cumberland Farms from "all claims, demands or actions brought by any party in connection with the condition of the Premises including ... those brought pursuant to any federal, state or local environmental law."

Two Rivers and Cumberland Farms attached an addendum to the agreement. In the addendum, Cumberland Farms accepted a $100,000 reduction in the purchase price, and Two Rivers agreed to assume responsibility for all necessary environmental remediation at the site. In pertinent part, the addendum provided as follows:

> It is expressly agreed between the parties that Paragraph 1 of the Agreement for Purchase and Sale of Real Estate dated September 14, 1991 ("Agreement") shall be amended to reflect a change in the purchase price from Seven Hundred Thousand ($700,000.00) Dollars to Six Hundred Thousand ($600,000.00) Dollars. This price reduction is given expressly with the mutual understanding of the parties that Buyer will be responsible for ALL necessary environmental remediation of any type, kind, and character which may be found necessary at 27 Chevron Drive, Reed, Pennsylvania ("Premises") and Buyer is purchasing the Premises in an "as is,

where is" condition as stated in Paragraph 12 of the Agreement.

Thus, ultimately, the parties agreed that Two Rivers would be responsible for environmental cleanup. However, this was not always true. Negotiations for the sale took place over many months, beginning sometime early in 1991, and the parties' positions on this issue changed over time. According to Emile Tayeh, a Cumberland Farms environmental engineer, during a meeting at the site in the spring of 1991 Cumberland Farms took responsibility for cleanup and for pursuing CUSA for its share of environmental responsibility while Two Rivers was supposed to have received indemnity from Cumberland Farms. At this meeting, Tayeh specifically told Two Rivers that pursuing CUSA would be Cumberland Farms' responsibility.

Later in the negotiations, the roles were reversed, and Two Rivers agreed to indemnify Cumberland Farms. Even later, the addendum placing the obligation on Two Rivers to remediate the site was negotiated between October 10 and October 21. At the latter stage, Tayeh testified, the intent was for Two Rivers to take all responsibility and to eliminate Two Rivers' right to pursue CUSA. Ronald Grabarek, Cumberland Farms' vice-president of real estate, testified that he assumed that the addendum meant that Two Rivers would be picking up CUSA's liability as well as Cumberland Farms' but that he cannot recall ever telling Two Rivers about that assumption. Grabarek also stated that during this 11–day period no one from either side mentioned CUSA.

Apparently, the reason Two Rivers accepted responsibility for cleanup was that at the time the addendum was proposed and accepted in October 1991, the principals in Two Rivers thought the cleanup would only cost $50,000 to $60,000. Thus, they were apparently willing to accept environmental liability in return for a $100,000 reduction in price. For its part, Cumberland Farms desired language showing a $100,000 reduction in the original purchase

price so that it could make a stronger case with CUSA for compensation. The reduction would clearly show that the environmental problems at the site had injured Cumberland Farms by requiring it to sell the property at a reduced value.

After the agreement was executed and the environmental problems turned out to be far worse than they originally appeared, Two Rivers employed a law firm to research the effect and validity of using an indemnification clause to shift contractual obligations, like the obligation Cumberland Farms had agreed to take from CUSA when it purchased the facility from CUSA.

### Discussion

CUSA contends that it can look to Two Rivers for any responsibility CUSA may have for cleaning up the site because CUSA is a third party beneficiary of the agreement of sale between Cumberland Farms and Two Rivers. Specifically, CUSA points to the addendum as conferring on it third party beneficiary status.

 *Scarpitti v. Weborg*, 530 Pa. 366, 609 A.2d 147 (1992), aptly summarizes Pennsylvania third party beneficiary law as follows:

> [A] party becomes a third party beneficiary only where both parties to the contract express an intention to benefit the third party in the contract itself, *Spires [v. Hanover Fire Ins. Co.,* 364 Pa. 52, 70 A.2d 828 (1950)], *supra, unless,* the circumstances are so compelling that recognition of the beneficiary's right is appropriate to effectuate the intention of the parties, and the performance satisfies an obligation of the promisee to pay money to the beneficiary or the circumstances indicate that the promisee intends to give the beneficiary the benefit of the promised performance. *Guy, supra.*

*Id.* at 371–72, 609 A.2d at 150–51 (brackets added) (emphasis in original).

As indicated, there are two tests for third party beneficiary status. The first one requires that the parties to the agreement indicate in the agreement itself that the purported beneficiary is a third party

beneficiary. The second test does not require that the purported beneficiary be mentioned in the contract but imposes two requirements. First, the circumstances must be so compelling that recognition of the beneficiary's right is appropriate to effectuate the intention of the parties. Second, (1) the performance satisfies an obligation of the promisee to pay money to the beneficiary or (2) the circumstances indicate that the promisee intends to give the beneficiary the benefit of the promised performance. Elaborating on this second test, the supreme court stated:

> The first part of the test sets forth a standing requirement which leaves discretion with the court to determine whether recognition of third party beneficiary status would be appropriate. The second part defines the two types of claimants who may be intended as third party beneficiaries. If a party satisfies both parts of the test, a claim may be asserted under the contract.

*Id.* at 371, 609 A.2d at 150.

CUSA argues that both tests have been satisfied. As to the first test, it maintains that the language of the addendum itself establishes that CUSA is a third party beneficiary of the agreement because the addendum places direct responsibility "for ALL necessary environmental remediation of any type, kind, and character which may be found necessary at" the site on Two Rivers. CUSA contends that this sweeping language, by placing "all" (and thus ultimate) responsibility on Two Rivers, provides protection for other parties that might be responsible as well. The defendant contrasts this broad phrasing with typical indemnity language that could have narrowed Two Rivers' responsibility to indemnifying Cumberland Farms, and Cumberland Farms alone, from any liability for the site. CUSA adds that if Two Rivers had similarly wanted to limit the responsibility it undertook in the addendum to Cumberland Farms alone, it could also have specified that in the addendum.

As to the second test, CUSA argues that the circumstances support the intent of both parties to make CUSA a third party beneficiary. The defendant relies on extrinsic evidence supporting its interpretation of the addendum and its position that the addendum bars Two Rivers from seeking compensation from CUSA. Specifically, the defendant points to Tayeh's testimony about the spring 1991 meeting in which Cumberland Farms had accepted responsibility for the cleanup and had told Two Rivers that any pursuit of CUSA would be by Cumberland Farms. CUSA maintains that this understanding did not change throughout the negotiations.

Finally, CUSA relies on the legal research Two Rivers' lawyers did in regard to the validity of transferring contractual obligations by using an indemnification clause, a transfer Cumberland Farms apparently accomplished here with its obligation to CUSA by way of the addendum. CUSA asserts that Two Rivers would not have conducted this research if it really believed that the addendum had not insulated CUSA from liability.

In opposition to this third party beneficiary theory, Two Rivers points out that CUSA is not mentioned in the addendum, the agreement of sale, or in any of the other documents connected to the sale except as a predecessor in the chain of title for goods and equipment that was also conveyed to Two Rivers. Nor was CUSA mentioned during negotiation of the sale or the addendum, and certainly not in connection with Two Rivers' assumption of environmental responsibility. Therefore, the parties to the sale did not intend CUSA to be a third party beneficiary of their agreement.

We agree with Two Rivers that CUSA is not a third party beneficiary. To begin with, CUSA is not mentioned in the agreement of sale or the addendum so the first test for third party beneficiary status is not satisfied here, "where both parties to the contract express an intention to benefit the third party in the contract it-

self . . ." *Scarpitti,* 530 Pa. at 372, 609 A.2d at 150.

Nor is the second test satisfied. The first prong of the second test calls for the exercise of the court's discretion. Under this prong, we cannot say that the circumstances are so compelling that it would be appropriate to recognize CUSA as a third party beneficiary of the agreement. Under the addendum, while Two Rivers is made responsible for all environmental remediation, that part of the agreement can be performed as written without making CUSA a third party beneficiary.

Thus, for example, Two Rivers remediates. If it can enforce a legal obligation on the part of CUSA that would assist in that remediation, nothing in the agreement prevents that, and such enforcement assists in fulfilling the obligation. If Two Rivers does not remediate, its obligation to do so can be enforced by Cumberland Farms, the only other signatory to the agreement and the addendum.

The situation is in stark contrast to cases like *Guy v. Liederbach,* 501 Pa. 47, 459 A.2d 744 (1983), and *Scarpitti, supra,* where third party beneficiary status was recognized when it was obvious that the beneficiaries were supposed to receive the benefit of the contract. In *Guy,* the beneficiary of a failed will, the testator's obviously intended beneficiary, was allowed to sue the lawyer who had drafted the will. In *Scarpitti,* homeowners in a subdivision were allowed to sue an architect who had agreed with the developer to review building plans to insure that they conformed to restrictions in the subdivision plan. The court noted that the intent of the agreement was to benefit homeowners by assuring them that other homeowners would comply with the restrictions.

In reaching our conclusion, we reject the defendant's argument that the language of the addendum, in placing responsibility on Two Rivers to remediate, rather than using language indemnifying Cumberland Farms in so many words, indicates an intent to benefit CUSA. We find some

support for our position, albeit not the strongest, in *Missouri Pacific RR. Co. v. Harbison–Fischer Mfg.*, 26 F.3d 531 (5th Cir.1994). In that case, the defendant, Harbison–Fischer, had vacated premises it had leased from the plaintiff, MOPAC, which later leased them to a third party, Custom Wire Manufacturing. In the court's words, the Custom Wire lease required Custom Wire to "comply with federal environmental laws and be responsible for any costs associated with the release of oil and hazardous substances." *Id.* at 534. A fire on the premises created or aggravated an environmental hazard. Lawsuits were started to allocate responsibility. One of the defendant's claims was that it was a third party beneficiary of the lease between the plaintiff and Custom Wire and could look to Custom Wire to clean up the premises. As the court phrased the argument:

> Harbison–Fischer notes that the MO-PAC/Custom Wire lease clearly provides that, as between MOPAC and Custom Wire, Custom Wire is responsible for remediation responsibilities arising during the course of the Custom Wire's (sic) lease. Harbison–Fischer further contends that it has a right to sue for enforcement of the MOPAC/Custom Wire lease because it is a third-party beneficiary of that lease. Harbison–Fischer claims that once Custom Wire delivered Harbison–Fischer a copy of the MOPAC/Custom Wire lease in exchange for Harbison–Fischer's building plans, Harbison–Fischer became a third-party beneficiary to the lease.

*Id.* at 540.

Applying Texas law on third party beneficiaries substantively similar to Pennsylvania law, the court rejected the "novel theory" that the exchange of documents vested the defendant with third party beneficiary status. More significantly for the instant case, it also examined the language of the Custom Wire lease looking for an intent to benefit Harbison–Fischer and concluded: "We have scoured the MO-PAC/Custom Wire lease to find any such intent and can find none. The lease never

mentions Harbison–Fischer, particularly with regard to the allocation of remediation responsibilities." *Id.*

Similarly, we conclude in the instant case that the imposition on Two Rivers of all responsibility for remediation does not make CUSA a third party beneficiary of Two Rivers' agreement with Cumberland Farms.

▉ We also reject CUSA's reliance on the testimony of Cumberland Farms' representatives as to the intent of the addendum. The language of the addendum is clear enough and requires no extrinsic evidence to explain it. "When the words of a contract are clear and unambiguous, the intent is to be found only in the express language of the agreement." *Amerikohl Mining, Inc. v. Mount Pleasant Township*, 727 A.2d 1179, 1182 (Pa.Cmwlth. 1999) (quoted case omitted). Cumberland Farms' subjective understanding of the scope of the addendum is not sufficient. *See Espenshade v. Espenshade*, 729 A.2d 1239, 1243 (1999).

CUSA is also factually wrong when it asserts that Cumberland Farms and Two Rivers never changed their initial understanding that only Cumberland Farms would have the right to pursue CUSA to recoup remediation costs. CUSA relies on statements to that effect made only in the spring of 1991, and at a time when Cumberland Farms was supposed to indemnify Two Rivers. Those statements are not relevant to the addendum because when it was adopted in October 1991 the situation was reversed, with Two Rivers accepting the obligation to remediate, not Cumberland Farms.

We also see no relevance to the legal research Two Rivers conducted or the belief of its principals that they had made an excellent bargain by accepting the responsibility to remediate in return for a $100,-000 reduction in the purchase price, thinking that it would only cost some $50,000 to $60,000 to remediate the site. As noted, the contract language controls so that

whether Two Rivers did research or not on the meaning of the contract is not going to alter the agreement. Similarly, whether the addendum turned out to be a good or bad bargain for Two Rivers vis-a-vis Cumberland Farms does not affect interpretation of the addendum.

We turn now to the second prong of this test (although failure to satisfy the first prong is sufficient to deny third party beneficiary status). CUSA relies on that part of the second prong dealing with whether the circumstances indicate that the promisee intends to give the beneficiary the benefit of the promised performance. CUSA argues that Cumberland Farms did intend to give CUSA the benefit of Two Rivers' promised performance because Cumberland Farms' witnesses testified that they intended CUSA to benefit from the addendum. We reject this position. The witnesses' assertion is belied by Tayeh's admission that he desired language showing a $100,000 reduction in the original purchase price so that Cumberland Farms could make a stronger case with CUSA for compensation. Attempting to charge the beneficiary for the value of the contractual benefit contradicts an intent to give the beneficiary (if that is the right word to use in this context) the benefit of the promised performance.

We will thus grant the plaintiff summary judgment on this aspect of its motion.

### D. *Two Rivers' Indemnity and Contribution Claims.*

Two Rivers has moved for summary judgment on its indemnity claim by arguing that CUSA caused all the contamination at the site. Since CUSA caused the contamination, it should be responsible for the payments Two Rivers has made, and will have to make, to remediate the site. As noted above, under Pennsylvania law, "the right to indemnity enures to a person who, without active fault on his own part, has been compelled, by reason of some legal obligation to pay damages occasioned by the negligence of another." *Andritz Sprout–Bauer, Inc. v. Beazer East, Inc.,* 12 F.Supp.2d 391, 420 (M.D.Pa.1998) (cit-

ing *Philadelphia Electric, supra,* 762 F.2d at 316).

In support, Two Rivers relies on evidence indicating that contamination did occur while CUSA was operating the Duncannon terminal as a petroleum storage and distribution center. To begin with, Two Rivers points to the tests performed at the terminal for environmental contamination before Two Rivers acquired the site in October 1991. We have already described these tests but do so again here.

To make the sale to Cumberland Farms, CUSA contracted with ERM–Northeast, Inc. to perform a visual and olfactory review of the Duncannon terminal.' In February 1986 and May 1986, ERM detected a hydrocarbon odor in water taken from three monitoring wells.

In December 1990, Two Rivers contracted with Benatec Associates to examine the terminal. Benatec found hydrocarbon contamination of the soil and groundwater. In one monitoring well, excessive concentrations of the hydrocarbon benzene were found, along with detectable amounts of the BTEX hydrocarbons.

As we have also already noted, Two Rivers had GeoServices, Ltd. examine the site again in October and November 1991, about one month after it had bought the property and before it stored any gasoline there. This examination confirmed the presence of high levels of total petroleum hydrocarbons (TPH) and BTEX hydrocarbons in the soil and groundwater. The levels around the transmix tank indicated that a spill had occurred in that area.

Two Rivers also relies on the remediation efforts at the site after PaDEP was notified, including monitoring of the soil and water. The transmix tank was removed on August 5, 1994. It was structurally sound but high levels of TPH and BTEX hydrocarbons were found in the soil above the tank. A pipe was cut to allow removal of the tank and about 1.5 gallons of fluid escaped. The soil that absorbed the fluid was removed.

In October 1995, the Chevron Research and Technology Company, Analytical Sciences Unit, identified the hydrocarbons in a sample from MW–6. The report stated, in pertinent part, that the sample consisted of approximately 50% regular-grade leaded gasoline and 50% #2 diesel fuel. The lead level of the gasoline indicated that it had been manufactured before July 1985. The diesel fuel was determined to be between nine and 12 years old at the time of sampling but could have been older or younger depending on the "biodegradation environment."

In November 1995, Worldwide Geosciences, Inc. (WGI) tested another sample from MW–6 for GeoServices, Two Rivers' environmental consultant. The sample consisted of 70 to 80% high-lead gasoline typically made before July 1985 and of 20 to 30% diesel fuel.

In December 1995, WGI tested another sample for Land Tech, CUSA's environmental consultant. The sample consisted of 70 to 80% "severely weathered" high-lead gasoline typically made before July 1985. The remainder of the sample was diesel fuel or "fuel oil derived hydrocarbons." This portion of the sample was "minimally biodegraded, and most probably had an exposure time of less than seven years."

Aside from the tests, a witness testified to a major gasoline spill at the site in August 1973. The gasoline came out of the transmix tank and spread to a pond about 75 yards away. There were several other releases of petroleum products at the Duncannon facility during Chevron's ownership and operation of it.

Two Rivers never stored leaded gasoline at the terminal. Given this and the projected age of the samples, the plaintiff contends that CUSA alone is responsible for the contamination and therefore must indemnify Two Rivers for remediation costs Two Rivers incurred under PaDEP supervision.

In opposition, CUSA argues that there is evidence of a spill after CUSA sold the terminal. It relies on the report of its expert, Tyler E. Gass. Essentially, Gass opines as follows. After CUSA sold the property, there were two recent releases of petroleum product at the site from two different source areas. He believes the releases occurred after the sale because the additive MTBE (methyl-tertiary-butyl-ether) is present in some samples and that additive was not used by CUSA until 1987, a year after the sale.

He concludes that the releases were recent by using the following analysis. The soil at the site is permeable and any contamination would move quickly. Using MTBE figures in MW–7 and a well down-gradiant to MW–7, MW–14, to track the movement of the "plume," the release leading to the contamination in these monitoring wells started "sometime after 1990." Using a similar analysis for MW–4 and a well down-gradient to MW–4, MW–12, the contaminating release for these wells started in 1992–93.

Gass also interprets the WGI December 1995 report as evidence of post-CUSA ownership releases. As noted, this report showed severely weathered gasoline along with diesel fuel or "fuel oil derived hydrocarbons" "minimally biodegraded" with "an exposure time of less than seven years." Gass asserts that there is too much BTEX in the sample to have come from the weathered gasoline, and it probably came from a fuel truck contaminated with gasoline that had delivered diesel fuel to the terminal for Two Rivers. Thus, the BTEX would have come from the diesel fuel identified as less than seven years old.

CUSA relies on other evidence of post-CUSA releases. Conceding evidence of a spill in August 1973, it points to the "spill" from the tank's piping system when the transmix tank was being removed in August 1994. It also insists that soil and water samples show that a significant portion of the contamination occurred after 1988. It relies on a Report of Chevron Research and Technology Company Analytical Unit, defendant's exhibit 54; Worldwide Geosciences' November 1995 Charac-

terization of Product Samples GSL TRT Site, defendant's exhibit 55; and Worldwide Geosciences' December 1995 Characterization of a Free Product Sample, defendant's exhibit 56.

In reply, Two Rivers criticizes the report's main assertions as having no factual bases. First, it contends that there is no competent evidence that CUSA did not use MTBE until after 1987, this information coming only by way of a lawyer's letter lacking in personal knowledge. Second, the December 1995 Worldwide Geosciences report estimated the diesel fuel as seven years old, which makes the fuel older than Two Rivers' acquisition of the terminal. Two Rivers adds that there is no "objective evidence" (by this, apparently, no evidence other than Gass's reading of the samples) that Cumberland Farms or Two Rivers had a release of diesel fuel at the site.

Two Rivers' own consultant, Peter Robelen, also attacks Gass' analysis. Robelen explains the changes Gass observed in the contaminant concentrations "as a result of water table fluctuations and consequent flushing by ground water." (Appendix to Two Rivers' statement of material fact, vol. 1, exhibit 3A).

Additionally, Two Rivers points out that CUSA is ignoring an October 1995 report from the Chevron Research and Technology Company, Analytical Sciences Unit, identifying the hydrocarbons in a sample from MW–6. The report stated, in pertinent part, that the sample consisted of approximately 50% regular-grade leaded gasoline and 50% # 2 diesel fuel. The lead level of the gasoline indicated that it had been manufactured before July 1985 and the diesel fuel was determined to be between nine and 12 years old (which dating from 1995, was between 1983 and 1986) at the time of sampling. This report also stated that the diesel fuel could have been older or younger depending on the "biodegradation environment." Finally, the plaintiff contends that WGI "compared the diesel fuel/No. 2 fuel oil taken from MW–6 in 1995 and stored by Two Rivers and

WGI concluded that they were not related." (Two Rivers' reply brief at p. 7).

■ The court is not impressed by CUSA's reliance on the August 1994 "spill" from the tank's piping system. This supposedly occurred while the transmix tank was being removed. The "spill" was about 1.5 gallons of "fluid," and the soil that had been contaminated was removed and placed on the pile with other contaminated soil. (CUSA exhibit 53). This "spill" could not have contributed to the pollution at the site.

Nor are we impressed by CUSA's reliance on the various samplings taken at the site. These studies all indicate that a significant portion of the contamination occurred before 1988, not after. The first study, defendant's exhibit 54, indicates leaded gasoline (which had to have come from CUSA, not Two Rivers) and diesel fuel between 9 and 12 years old .(placing the fuel in 1986 at the latest and 1983 at the earliest). The second study, defendant's exhibit 55, indicates a leaded gasoline before July 1985 and the MW–6 diesel fuel is different from the received product sample. The third study, defendant's exhibit 56, indicates leaded gasoline before July 1985, albeit along with diesel fuel which had an "exposure time of less than seven years."

Nor are we particularly impressed by its expert's report, given the history of the site and the relative use both Two Rivers and CUSA put the property to. Nonetheless, since we are not the factfinder, we must allow CUSA to proceed with its theory that two plumes of contamination can be traced to "sometime after 1990" and during 1992–93. Robelen, Two Rivers' expert, may be correct that these simply reflect changes in the water level and flushing of old contamination but that is for the factfinder to resolve. In addition, the absence of MTBE in CUSA's gasoline before 1987 is crucial to CUSA's position, and CUSA will need more at trial than its lawyer's hearsay statement that there was none present before 1987.

The factfinder would also have to resolve the time frame for the presence of the diesel fuel. In this regard, we acknowledge that Two Rivers asserts that testing revealed that its diesel fuel was different from the diesel fuel contaminating the site. However, that assertion is not in the record. The record only shows that a "received sample" of diesel fuel was different from a site sample. (CUSA exhibit 55).

We therefore cannot grant Two Rivers' motion for summary judgment on its indemnity claim.[9]

### E. *Two Rivers' Contribution Claim and CUSA's Contribution Claim.*

Two Rivers has moved for summary judgment on its contribution claim and on CUSA's contribution claim. Given what we have decided in connection with Two Rivers indemnity claim, we believe that the contribution issue should be decided at trial.[10]

### V. *Conclusion.*

The only matters left for trial will be the Two Rivers' indemnity claim and the parties' claims for contribution. We will issue an appropriate order.

### ORDER

AND NOW, this 27th day of March, 2000, it is ordered that:

1. The plaintiff's motion for partial summary judgment on the issue of liability (doc. 59) is resolved as follows:

(a) the motion on its Tank Act claim is denied;

(b) the motion on defendant's CERCLA and PaHSCA claims is dismissed as moot since the defendant has agreed to withdraw those claims;

(c) the motion is granted as to the defendant's contract claim, defendant's twenty-sixth affirmative defense, and de-

fendant's Tank Act claim and the Clerk of Court is directed to enter judgment in favor of the plaintiff and against the defendant on these claims;

(d) the motion is denied as to the plaintiff's indemnity and contribution claims and the defendant's contribution claim.

2. The defendant's motion for summary judgment (doc. 74) is resolved as follows:

(a) the motion is granted as to the plaintiff's Tank Act, CERCLA, PaHSCA, and RCRA claims and the Clerk of Court is directed to enter judgment in favor of the defendant and against the plaintiff on these claims;

(b) the motion is denied as to the plaintiff's contribution and indemnity claims.

3. The defendant's CERCLA, PaHSCA, and indemnity claims are dismissed.

4. The defendant's motion for summary judgment (doc. 64) on its Tank Act counterclaim is dismissed as moot.

---

**9.** We reject CUSA's remaining arguments against the indemnity claim, that Two Rivers purchased the property at a discount knowing it was contaminated and that Two Rivers has not made any payments to a third party.

**10.** Two Rivers also moved for summary judgment on CUSA's indemnity claim but CUSA has voluntarily withdrawn that claim.