**DEGUSSA CONSTR. CHEM. OPERATIONS, INC.**
Plaintiff,

v.

**BERWIND CORP., et al., Defendants.**

No. CIV.A.02–1368.

United States District Court,
E.D. Pennsylvania.

Aug. 15, 2003.

396

Mark A. Bilut, Steven H. Hoeft, Todd R. Wiener, McDermott Will & Emery, Chicago, IL, A. Richard Feldman, Baszelon Less & Feldman PC, Philadelphia, PA, for Plaintiff.

Kristin M. Hynd, Dechert, Philadelphia, PA, for Defendants.

## MEMORANDUM

BAYLSON, District Judge.

Presently before the Court are Plaintiff's Motion for Partial Summary Judgment and Defendants' Motion for Summary Judgment. Degussa Construction Chemicals Operations, Inc. ("Degussa") brought the instant action against Berwind Corporation and Neapco, Inc. (collectively, "Neapco") seeking damages and other relief pursuant to the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. § 9601 *et seq.* ("CERCLA"), the Resource Conservation and Recovery Act, 42 U.S.C. § 6972 ("RCRA"), the Hazardous Sites Cleanup Act, Pa. Stat. Ann. tit. 35, § 6020.101, *et seq.* ("HSCA"), the Storage Tank and Spill Prevention Act, Pa. Stat. Ann. tit. 35, § 6021.101, *et seq.* ("STSPA"), the Pennsylvania Clean Streams Law, Pa. Stat. Ann. tit. 35, § 691.1, *et seq.* ("PCSL"), and various state law claims.

For the reasons set forth below, the Court will deny Plaintiff's Motion for Partial Summary Judgment and will grant in part and deny in part Defendants' Motion for Summary Judgment.

## I. Factual and Procedural Background

Degussa is the current owner of property located at 860 Cross Street, Pottstown, Pennsylvania ("Property"), which is undisputedly contaminated with a chlorinated solvent called trichloroethylene ("TCE"). (Mem. Supp. Neapco's Mot. Summ. J. at 1, 5; Mem. Supp. Degussa's Mot. Partial Summ. J. at 1.) The Property consists of an approximately 30,000 square foot, two-story building on a 0.86 acre parcel of land, and is located in a heavily industrialized area. (Mem. Supp. Neapco's Mot. Summ. J. at 5.)

Neapco Products, Inc., a predecessor in interest to defendant Neapco, Inc. and a wholly-owned subsidiary of Berwind Corporation[1], owned and conducted operations at the Property from 1958 to 1971. *Id.* at 4. Neapco employees referred to the plant at the Property as "Plant # 2" because it was essentially a support facility for Neapco's main plant, which was located up the street from the Property. *Id.* at 6. All manufacturing operations during the 1958 to 1968 time period were done at Neapco's main plant, and Plant # 2 was used for hand assembly, storage and shipping of parts manufactured at the main plant. *Id.* In approximately 1967, these operations were consolidated into a new Neapco facility. *Id.* at 7.

In approximately 1968, Neapco began manufacturing fuse sleeves for the United States Navy at the Property. A fuse sleeve is a timing device for artillery shells that prevents the shells from detonating prior to reaching its target. *Id.*

The fuse sleeve operations conducted for approximately three years at the Property began with hollow cylindrical aluminum

---

[1] Berwind Corporation, by virtue of an agreement with the purchaser of Neapco, Inc. agreed to assume all environmental liabilities of Neapco, Inc. for the time period at issue in this litigation. (Mem. Supp. Neapco's Mot. Summ. J. at 4.)

forgings in the basic shape of the fuse sleeve that were delivered to the Property by an outside vendor. *Id.* Precision machining was conducted in several steps to refine the shape of the forgings and to add holes, threads, and other physical characteristics to the sleeves at a series of stations within the facility. *Id.*

After machining, the fuse sleeves were anodized in the far eastern (front) portion of the facility. *Id.* at 8. Anodizing is a process by which a metal surface, in this case aluminum, is converted to a durable oxide material, typically within a dilute acid solution through which an electric current is passed. *Id.* at 8. Anodizing is conducted in a sequence of steps, which typically includes cleaning, water rinsing, and often an intermediate acid rinse prior to the actual anodizing. *Id.* The anodizing operations at the facility were conducted in a series of approximately three to four steel tanks in close proximity. *Id.* The sleeves were placed into steel baskets by hand, then raised and lowered into each tank using a hand-operated crane. *Id.* After anodizing, the finished parts were packaged for shipping. *Id.*

The cleaning step of the anodizing process has been the principal focus of this case. *Id.* Each cleaning tank was a steel structure with a total capacity of 1,000 to 3,000 gallons. *Id.* at 8–9. The contents of the cleaning tanks are in dispute. *Id.* at 9.

Degussa is the successor in interest to various entities that owned and conducted operations there since purchasing the Property from Neapco in November 1971, namely Contech, Inc., Rexnord Chemical Products, Inc., ChemRex, Inc. and SKW–MBT Operations, Inc. (Mem. Supp. Neapco's Mot. Summ. J. at 5; Mem. Supp. Degussa's Mot. Partial Summ. J. at 2.) From 1971 until 1995, Degussa mixed polyurethane and polysulfide based adhesives and coatings in its plant. (Mem. Supp.

Degussa's Mot. Partial Summ. J. at 2.) In 1995, Degussa ceased operations on the Property, but has maintained its ownership. *Id.*

An environmental report pertaining to the Property was prepared by LAN Associates on October 24, 1988 as part of the sale of the Property from one Degussa predecessor to another (Rexnord to Chem-Rex). (Mem. Supp. Neapco's Mot. Summ. J. at 15.) In 2000, Degussa's environmental consultant, Conestoga–Rovers & Associates, discovered that the soil and groundwater on the Property and underneath the plant were contaminated with TCE. (Mem. Supp. Degussa's Mot. Partial Summ. J. at 2.) The results of Conestoga–Rovers & Associates' investigations are summarized in four reports dated April 2000, May 2000, March 2001, and June 2001. (Mem. Supp. Neapco's Mot. Summ. J. at 15.) In December 2002, Environ, consultants hired by Neapco in connection with this litigation, conducted a soil and groundwater sampling program on the Property. *Id.*

Degussa filed its Complaint in the instant action on March 18, 2002. The parties filed the Cross–Motions for Summary Judgment on June 18, 2003.

## II. Legal Standard and Jurisdiction

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). An issue is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A factual dispute is "material" if it might affect the outcome of the case under governing law. *Id.*

A party seeking summary judgment always bears the initial responsibility for informing the district court of the basis for its motion and identifying those portions of the record that it believes demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Where the non-moving party bears the burden of proof on a particular issue at trial, the moving party's initial burden can be met simply by "pointing out to the district court that there is an absence of evidence to support the non-moving party's case." *Id.* at 325, 106 S.Ct. 2548. After the moving party has met its initial burden, "the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." FED. R. CIV. P. 56(e). Summary judgment is appropriate if the non-moving party fails to rebut by making a factual showing "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex,* 477 U.S. at 322, 106 S.Ct. 2548. Under Rule 56, the Court must view the evidence presented on the motion in the light most favorable to the opposing party. *Anderson,* 477 U.S. at 255, 106 S.Ct. 2505.

This Court has subject matter jurisdiction over the claims pursuant to 42 U.S.C. § 9613(b), which vests exclusive jurisdiction of CERCLA claims in the federal courts, and pursuant to 28 U.S.C. §§ 1331 and 1367. Venue is appropriate under 28 U.S.C. § 1391.

## III. Discussion

### A. Neapco's Motion for Summary Judgment

#### 1. CERCLA Liability under § 107

CERCLA was enacted to provide for liability and remediation of hazardous substances in the environment and for cleanup of inactive hazardous waste sites. *New Jersey Turnpike Auth. v. PPG Indus., Inc.,* 197 F.3d 96, 103 (3d Cir.1999). Section 107 of CERCLA assigns liability to four categories of potentially responsible parties ("PRPs") for costs of removal or remediation or hazardous waste. *Id.* (citing 42 U.S.C. § 9607(a)). A PRP includes: (1) the current owner or operator of a facility; (2) any person who owned or operated the facility at the time of the disposal of a hazardous substance; (3) any person who arranged for disposal or treatment, or arranged for transport for disposal or treatment of hazardous substances at a facility; and (4) any person who accepts or accepted hazardous substances for transport to sites selected by such person. *Id.* (citing *New Castle County v. Halliburton NUS Corp.,* 111 F.3d 1116, 1120 (3d Cir.1997)).

In order to prove CERCLA liability under section 107, a plaintiff must prove that: (1) the defendant is a potentially responsible party; (2) hazardous substances were disposed of at a "facility"; (3) there has been a "release" or "threatened" release of hazardous substances from the facility into the environment; and (4) the release or threatened release has required or will require the plaintiff to incur "response costs." *Id.* (citations omitted). If a plaintiff proves these four elements, the burden shifts to the defendant to prove by a preponderance of the evidence that the release or threat of release of a hazardous substance and the damages resulting therefrom were caused solely by: (1) an act of God, (2) an act of war, and/or (3) an act or omission of a third party other than an employee or agent of the defendant, or than one whose act or omission occurs in connection with a contractual relationship of the defendant as long as certain conditions are met. 42 U.S.C. § 9607(b).

■ The Third Circuit has held that a PRP may not bring a section 107 cost recovery action against another PRP. *Halliburton,* 111 F.3d at 1119. A section 107 cost recovery action may only be pursued by an innocent party that has undertaken hazardous waste cleanup, and section 107 imposes strict liability and joint and several liability on PRPs for costs associated with cleanup and remediation. *PPG Indus.,* 197 F.3d at 104 (citing *Halliburton,* 111 F.3d at 1120–21).

### a. Neapco's Contentions

Neapco argues that Degussa cannot bring a cost recovery claim pursuant to § 107 of CERCLA because Degussa itself is a PRP, and Third Circuit precedent clearly establishes that PRPs cannot bring cost recovery actions pursuant to § 107 of CERCLA. (Mem. Supp. Neapco's Mot. Summ. J. at 19–20.) Neapco further argues that Degussa is a PRP because it is the current owner of the Property and because there is evidence that it contributed to the contamination at the Property. *Id.* at 21–22.

### b. Degussa's Contentions

Degussa argues that it is an innocent party entitled to bring a section 107 action because it has not admitted liability under CERCLA, it has not been found liable under CERCLA, and it has not resolved its liability to the United States in a judicially approved settlement. (Mem. Opp'n Neapco's Mot. Summ. J. at 18.)

■ As the current owner of the Property, Degussa falls within a category of PRPs. *See* 42 U.S.C. § 9607(a)(1). Degussa argues, however, that it is entitled to the innocent landowner affirmative defense. (Compl.¶ 35.) A party asserting the "innocent owner" defense must prove the following elements by a preponderance of the evidence: (1) another party was the sole cause of the release of hazardous sub-stances and the damages caused thereby; (2) the purchasing landowner did not actually know or have reason to know of the presence of the hazardous substance at the time of acquisition; (3) the purchasing landowner undertook appropriate inquiry at the time of acquisition, in order to minimize liability; and (4) the purchasing landowner exercised due care once the hazardous substance was discovered. *Grand St. Artists v. GE,* 28 F.Supp.2d 291, 295 (D.N.J.1998) (citation omitted).

As more fully explained below, there are genuine issues of material fact as to whether Degussa caused the TCE contamination and whether Neapco was the sole cause of the TCE contamination. As a result, there are genuine issues of material fact as to whether Degussa is entitled to the "innocent landowner" defense and whether Degussa is a PRP that cannot bring a section 107 cost recovery action against Neapco. The Court, therefore, will deny Neapco's Motion for Summary Judgment on Degussa's section 107 cost recovery claim.

### 2. CERCLA Liability under § 113

■ Section 113(f) of CERCLA provides, in pertinent part, "Any person may seek contribution from any other person who is liable or potentially liable under section 107(a), during or following any civil action under section 106 or under section 107(a)." Thus, an entity found by the court to be a responsible party may seek contribution from other polluters. *United States v. Union Corp.,* No. CIV.A.80–1589, 2003 U.S. Dist. LEXIS 12341, at *13 (E.D. Pa. June 20, 2003).

■ Although a potentially responsible person should not be permitted to recover all of its costs from another potentially responsible person, Section 113(f) allows a plaintiff to recoup that portion of its ex-

penditures that exceeds its fair share of the overall liability. *Halliburton*, 111 F.3d at 1122. The party seeking contribution bears the burden of establishing a reasonable basis for apportioning liability to a third party and has the burden of proving each element of the claim by a preponderance of the evidence. *Union Corp.*, 2003 U.S. Dist. LEXIS 12341, at *13 (citations omitted). The contribution liability of a responsible person corresponds to that person's equitable share of the total liability. *Id.*

### a. Neapco's Contentions

■ Neapco argues that Degussa cannot bring a CERCLA contribution action against Neapco because Neapco is not a PRP under CERCLA. (Mem. Supp. Neapco's Mot. Summ. J. at 28.) Neapco contends that the theory upon which Degussa may pursue its CERCLA contribution action against Neapco is if Neapco was a "person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of." *Id.* Neapco further argues that there is no evidence that any hazardous substances were used, stored or disposed of during Neapco's tenure at the Property, and that not a single current or former Neapco employee expressed a recollection of the use of TCE at the Property. *Id.* at 31. Finally, Neapco argues that the report of Degussa's expert, Ron Frehner, is not sufficient to create a genuine issue of material fact as to Neapco's use, storage or disposal of TCE. *Id.* at 33.

### b. Degussa's Contentions

Degussa argues that Neapco used and disposed of TCE on the Property by using TCE as a solvent to clean aluminum fuse sleeves, and that there are genuine issues of material fact regarding the cause of the TCE contamination, particularly whether Neapco disposed of TCE on the Property or contributed to the TCE contamination on the Property. (Mem. Opp'n Neapco's Mot. Summ. J. at 5–7.) Degussa also asserts that because Neapco's response to Requests For Admissions could not admit or deny the use of TCE, the Court should find an admission. Degussa did not file a motion to determine the sufficiency of Neapco's response. Rule 36, Federal Rules of Civil Procedure, does not authorize a binding admission for all purposes based on the response made by Neapco at the outset of the litigation.

### c. The principal issue—did Neapco use TCE?

Both sides have submitted extensive deposition excerpts and other factual materials to try to prove, or dispute, whether TCE was used by Neapco. The briefs of both counsel describe the various deposition excerpts in the light most favorable to their clients. Although this is expected advocacy, the Court's obligation is to ascertain whether there are genuine issues of material fact for trial. In doing so, the Court must give the favorable inferences to the party opposing summary judgment. *See New Jersey Turnpike Authority v. PPG Industries, Inc.*, supra, 197 F.3d at 111 (affirming grant of summary judgment). The Court has concluded, from a review of the factual record presented, that there is no direct evidence that the defendant used TCE. However, there is some circumstantial evidence and the Third Circuit has squarely held that circumstantial evidence, when presented by a party opposing a summary judgment, can be sufficient to defeat summary judgment. *See*, most recently, *Estate of Smith v. Marasco*, 318 F.3d 497 (3rd Cir.2003). Although DeGussa relies on isolated excerpts from the depositions of several different witnesses in its attempt to weave a fabric

strong enough to warrant the denial of summary judgment, the evidence has resulted in some fabric, albeit a thin fabric, to require this Court, under Third Circuit case law, to deny summary judgment.

Degussa disputes Neapco's contention that not a single current or former Neapco employee expressed a recollection of the use of TCE at the Property. Degussa refers to the following deposition testimony of Lars Hansen, Neapco's Quality Control Manager when Neapco manufactured fuze sleeves on the Property:

Q: Did this [cleaning] tank have a solvent in it?

A: As far as I know, yeah.

Q: Do you know what type of solvent was in this cleaning tank?

A: You told me.

Q: I am curious as to whether you know what was in the cleaning tank?

A: At that time, because people can use different solvents, okay. When you mention the name to me, that sounds familiar.

Q: You're referring to a conversation that we had over the phone where I referred to a material called trichloroethylene?

A: That's correct.

Q: You are telling me that that name sounded familiar?

A: It's a very familiar solvent used today in industry for cleaning greasy parts.

Hansen Dep. at 40–41.

However, Hansen later testified as follows:

Q: Sitting here today, do you recall whether NEAPCO, during the period that you were Quality Control Manager, during the manufacture of fuze [sic] sleeves, used trichloroethylene in the cleaning of fuze [sic] sleeves?

A: No. I cannot say that they did use trichloroethylene. The only thing I told him is it sounds familiar. That's what I told my lawyer. I'm sorry; I didn't tell him. I told him that.

*Id.* at 82. Although the testimony is less than precise and is not consistent, a jury could find that the witness had admitted Neapco's use of TCE at the Property in a conversation with Degussa's attorney prior to the deposition and the testimony "sounds familiar" is an acknowledgment to which a jury might attach some evidentiary weight.[2]

Degussa also relies on the deposition testimony of another former Neapco employee, Parker Sell, who worked in Neapco's cleaning and anodizing operation for fuse sleeves. Sell Dep. at 14. Sell testified that Neapco used solvents in the cleaning tank, but that he did not know whether the cleaning tanks contained TCE. *Id.* at 40–41.

Finally, Degussa relied on the deposition of Robert Eckert, another former Neapco employee, who testified that Neapco "used solvents all the time" "for cleaning different things." Eckert Dep. at 36. Eckert also testified as follows:

Q: Have you ever heard of the chemical called TCE or trichloroethylene?

A: Yes. Trichloroethylene. Yes.

Q: Do you know if NEAPCO used trichloroethylene at plant two[3]?

---

**2.** The attorney who participated in this telephone conference may be a witness at trial, and counsel should observe any relevant ethical considerations.

**3.** Plant two is the plant located on the Property. Plant one was Neapco's main plant, which was located up the street from the Property. (Mem. Supp. Neapco's Mot. Summ. J. at 6.)

A: I remember seeing a barrel some place, but I don't remember if it was down plant two or at plant one. I really don't remember that. All I remember is seeing on the end of the barrel, T–R–I–C–H–L–O–R. That's all I remember seeing. Memory is funny .... I do remember seeing a barrel of trichloro. But which plant, that I can't remember. All I remember seeing is the end of the barrel. I can picture it now but I don't remember which plant it was.

*Id.* at 22–23.

The Court finds that the depositions of these witnesses, in the context of summary judgment, prevent the Court from ruling as to as a matter of law because the testimony presents genuine issues of material fact as whether Neapco used solvent on the Property and whether this solvent was TCE.

#### d. Disposal of TCE by Neapco

■ Degussa relies on the depositions of two former Neapco's employees to support its contention that there are genuine issues of material fact as to whether Neapco disposed of TCE on the Property. (Mem. Opp'n Neapco's Mot. Summ. J. at 11–12.) One employee, Victor Jacketti, testified as follows:

Q: Do you know how often the contents of these four [cleaning] tubs were cleaned?

A: No, sir.

Q: They were not cleaned on a regular basis?

A: No, sir.

Q: What happened to the contents of these tubs that were cleaned out?

A: They would, the liquid would go into a trough in the back of the tubs into the sewer.

\* \* \* \* \* \*

Q: Was the trough in the floor of the building?

A: Yes.

Q: Did it have any type of grate over the top of it?

A: I don't remember.

Q: How deep was the trough?

A: Maybe eight to ten inches.

Q: Was the trough surrounded or made of concrete?

A: It was in the form of concrete.

Q: You mentioned this trough connected to the sewer.

A: The pipe that ran from the trough went into, probably the sewer.

Q: Do you know if it ran into the sanitary sewer or the storm sewer or you do not know?

A: We only have one sewer in the borough and that's the sewer plant. It goes to the sewer plant.

Q: So in Pottstown there's a combined storm and sanitary sewer?

A: I don't know if it's combined or not.

Q: So it was your understanding that it ran to a sewer which connected to the Pottstown sanitary plant?

A: Yes, sir.

Jacketti Dep. at 66–69.

Parker Sell also testified that, when the four cleaning tanks were cleaned, the solvent from each tank drained through pipes that were connected to a main pipe in the concrete trough, which drained into the sewer system. Sell Dep. at 82–93

The Court previously found that there are genuine issues of material fact as to whether Neapco used solvent in the cleaning tanks, whether this solvent was TCE, and thus, the depositions of Jacketti and Sell present a genuine issue of material fact as to whether TCE was the solvent disposed of on the Property.

Degussa also relies on the report of its expert Mr. Frehner, whose fifth opinion states as follows:

*Statement of Fifth Opinion*

Solvents were stored, used and disposed at the Pottstown site during the period of time that Neapco was operating. Trichloroethylene (TCE) was likely the solvent used at the Pottstown Site.

*Basis for Fifth Opinion*

a) TCE was widely used in both large and small industries and was commonly used as industrial solvent between 1958 and 1971 based on publications by ATSDR, 1989; NIOSH, 1973; NIOSH, 1978; Doherty, 2000 which are listed as potential exhibits.

b) Deposition of Parker Sell (1/29/03) where Mr. Sell states that Neapco stored solvent in a tank on site, used solvent to clean fuze sleeves and discharged solvent to a trench in the floor of the building.

c)Deposition of Lars Hansen (12/11/02) where Mr. Hansen states that Neapco stored solvent in a tank on site and used solvent on site to clean fuze sleeves. Mr. Hansen also stated that the trench drain in the floor of the building was self-contained and not connected to the sewer system.

d) TCE (and associated compounds) were found in soil, soil gas and groundwater at the Pottstown site.

Neapco objects to Degussa's reliance on its expert's opinion, asserting that it is factually unsupported and therefore inadmissible on summary judgment, citing, *inter alia, Advo, Inc. v. Philadelphia News-*

*papers, Inc.,* 51 F.3d 1191, 1198–99 (3rd Cir.1995). In *Advo,* the Court reviewed the testimony presented in opposition to summary judgment, found that there was no direct evidence, and that the expert used cost estimates which lacked a factual basis.[4] Although Neapco claims that Mr. Frehner's opinion is not credible and speculative, the Court concludes that, as slim as the facts on which Mr. Frehner relied may be, they are circumstantial evidence, and taken together, are sufficient to raise a genuine issue of material fact requiring a trial. Thus, the Court will deny Neapco's Motion for Summary Judgment on Degussa's CERCLA contribution claim.

**3. Liability under RCRA § 7002(a)(1)(B)**

▮ Liability under the citizen suit provision, § 7002(a)(1)(B) of the RCRA, is imposed on any person "who has contributed or who is contributing to the past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste which may present an imminent and substantial endangerment to health or the environment . . ." 42 U.S.C. § 6972(a)(1)(B). Use of the word "may" was intended by Congress to provide the courts with broad equitable powers that are not limited to emergency-type situations, but rather extend to eliminating any risk posed. *L.E.A.D. Group of Berks v. Exide Corp.,* No. CIV.A.96–3030, 1999 WL 124473, 1999 U.S. Dist. LEXIS 2672, at *25–26 (E.D.Pa. Feb. 19, 1999) (citing *United States v. Price,* 688 F.2d 204, 214 (3d. Cir.1982)). While the potential for harm should be great, neither the term

---

**4.** *Advo* was an antitrust case, in which courts have adopted different and somewhat more rigid rules for summary judgment motions, than in environmental cases. Compare the Third Circuit's recent decision affirming summary judgment in an antitrust case, *InterVest,*

*Inc. v. Bloomberg L.P., et al.,* 340 F.3d 144 (3rd Cir.2003) with *United States v. CDMG Realty Co.,* 96 F.3d 706, 719–20 (3d Cir.1996), a decision reversing summary judgment in an environmental dispute.

"imminent" nor "endangerment" requires a showing of actual harm, but merely a risk of harm that is imminent. *Id.* at *26, 1999 WL 124473 (citations omitted).

### a. Neapco's Contentions

Neapco argues that Degussa cannot bring a claim for injunctive relief pursuant to § 7002(a)(1)(B) of the RCRA because there is no evidence of an imminent endangerment at the Property as required by § 7002(a)(1)(B). (Mem. Supp. Neapco's Mot. Summ. J. at 39.)[5] In support of its argument, Neapco relies on the Middle District of Pennsylvania's opinion in *Two Rivers Terminal, L.P. v. Chevron USA, Inc.,* 96 F.Supp.2d 432 (M.D.Pa.2000).

In *Two Rivers,* the plaintiff, the owner of a gasoline and fuel oil terminal, sued the former owner of the property claiming violations of various acts, including the RCRA. The defendant moved for summary judgment on the plaintiff's RCRA claim on the basis that there was no evidence of an imminent endangerment on the property. *Id.* at 444. In support of its position that there was a threat of future harm, the plaintiff relied on the opinion of its environmental consultant's opinion that there was imminent danger because there was a water supply on the site and harm could be caused if a person were to drink water from the supply. *Id.* at 445. Although the Court recognized that there was contamination at the property, it agreed with the defendant's position that there was no danger of imminent harm and granted the defendant's motion for summary judgment on the RCRA claim. *Id.* at 446.

Neapco makes similar arguments to the arguments made by the plaintiff in *Two Rivers.* Neapco contends that the cleanup of the Property is not subject to an order by the Pennsylvania Department of Environmental Protection ("DEP"), Degussa's environmental consultants have recommended natural attenuation as the remedy for the groundwater contamination, Degussa's environmental consultants have noted that the Property is not within either the 100–year or the 500–year flood plain of the river, Degussa's environmental consultants have not identified potable use of groundwater in the area or any potential impacts from the contamination to drinking water wells, and the Property is in a heavily industrialized area with regional groundwater contamination issues. (Mem. Supp. Neapco's Mot. Summ. J. at 41.)

### b. Degussa's Contentions

Degussa argues that there are genuine issues of material fact regarding: (1) whether the Property presents an imminent and substantial endangerment, and (2) the significance of the onsite and offsite hazards posed by the TCE contamination. (Mem. Opp'n Neapco's Mot. Summ. J. at 20–22.) Degussa relies on its June 2003 Cleanup Report submitted to the DEP that states that the building on the Property currently has carcinogenic vapors from TCE and its breakdown products in excess of levels considered safe for human health. *Id.* at 21 (citing Ex. AA, App. C.) The June 2003 Cleanup Report also states that there must be an 88% reduction in the amount of TCE under the building to meet human health safety standards. *Id.*

---

**5.** Neapco argues that Degussa cannot prove the necessary RCRA element that Neapco is a "contributor" because there is no evidence that Neapco spilled, used, stored or disposed of TCE or any other hazardous substance during its tenure at the Property. (Mem. Supp. Neapco's Mot. Summ. J. at 42.) The Court previously found that there is a genuine issue of material fact as to whether Neapco used or disposed of TCE during its tenure at the Property. Thus, the Court will focus on whether there is a genuine issue of material fact as to whether the Property presents an imminent and substantial endangerment.

Degussa further argues that Neapco's own investigation of the Property showed TCE levels in the groundwater at 49,000 parts per billion, which is 3000 times the five parts per billion level considered safe by the Commonwealth of Pennsylvania. *Id.* at 22 (citing Ex. AA at 10, 12). Degussa, therefore, concludes that there is a current, actual, adverse and substantial right to human health on the Property.

The Court does not agree with Neapco that the decision in *Two Rivers,* which is persuasive, but not controlling authority, compels the Court to find that there was no danger of imminent harm. In this case, unlike the situation in *Two Rivers,* Degussa offered evidence that there may be an imminent risk of harm, other than evidence relating to groundwater contamination. Without deciding whether the use and disposal of TCE present an imminent and substantial endangerment to health or the environment, the Court finds Degussa's evidence presents a genuine issue of material fact as to whether the risk of harm is imminent. The Court, therefore, will deny Neapco's Motion for Summary Judgment as to Degussa's RCRA claim.

### 4. Liability under HSCA §§ 701 and 702

Section 701(a) of the HSCA provides in pertinent part:

(a) General rule.—Except for releases of hazardous substances expressly and specifically approved under a valid Federal or State permit, a person shall be responsible for a release or threatened release of a hazardous substance from a site when any of the following apply:

(1) The person owns or operates the site:

(i) when a hazardous substance is placed or comes to be located in or on a site;

(ii) when a hazardous substance is located in or on a site, but before it is released; or

(iii) during the time of the release or threatened release.

PA. STAT. ANN. tit. 35, § 6020.701(a). CERCLA and the HSCA resemble each other in some respects, but there are also material differences. *Andritz Sprout–Bauer, Inc. v. Beazer East, Inc.,* 12 F.Supp.2d 391, 407 (M.D.Pa.1998).

The HSCA differs from CERCLA in that it recognizes liability for a category of PRPs excluded under CERCLA. *Id.* Liability attaches under CERCLA to a former owner or operator only if there is evidence that disposal of hazardous substances occurred during that person's tenure of ownership. *Id.* at 407–08. Potential liability under the HSCA is broader in that the HSCA imposes liability on intervening landowners; that is, any person in the chain of title is subject to liability even in the absence of evidence that it contributed to the current environmental problem. *Id.* at 408.

Under § 702 of the HSCA, a responsible person is strictly liable for response costs "which result from the release or threatened release or to which the release or threatened release significantly contributes." PA. STAT. ANN. tit. 35, § 6020.702.

Neapco argues that although the HSCA is broader than CERCLA, Degussa cannot bring claims pursuant to §§ 701 and 702 of the HSCA because the evidence demonstrates that Degussa is a PRP at the Property and not an innocent landowner. (Mem. Supp. Neapco's Mot. Summ. J. at 44.) As stated above, there are genuine issues of material fact as to whether Degussa is entitled to the "innocent landowner" defense and, therefore, whether Degussa is a liable party under § 701 of the HSCA. Thus, the Court will deny Neapco's

Motion for Summary Judgment on Degussa's claims pursuant to §§ 701 and 702 of the HSCA.

### 5. Liability under HSCA § 705

■ Section 705 of the HSCA provides, in pertinent part: "A person may seek contribution from a responsible person under section 701, during or following a civil action under section 507 or 1101." PA. STAT. ANN. tit. 35, § 6020.705(a). The Court shall enter judgment allocating liability among the liable parties, and the burden is on each party to show how liability should be allocated. *Id.* § 6020.705(b).

Neapco argues that Degussa cannot bring a HSCA contribution action against Neapco because Neapco is not a responsible person under the HSCA because there is no evidence that Neapco used, stored or disposed of any hazardous substances during the time Neapco owned the Property and there is no evidence that any hazardous substances were located at the Property regardless of the source during the time Neapco owned the Property. (Mem. Supp. Neapco's Mot. Summ. J. at 44.)

As stated above, the Court previously found that there is a genuine issue of material fact as to whether Neapco used or disposed of TCE during its tenure at the Property. The Court, therefore, will deny Neapco's Motion for Summary Judgment on Degussa's HSCA contribution claim.

### 6. Liability under the STSPA

The STSPA provides, in pertinent part, [I]t shall be presumed as a rebuttable presumption of law in civil and administrative proceedings that a person who owns or operates an aboveground or underground storage tank shall be liable, without proof of fault, negligence or causation, for all damages, contamination or pollution within 2,500 feet of the perimeter of the site of a storage tank containing or which contained a regulated substance of the type which caused the damage, contamination or pollution. Such presumption may be overcome by clear and convincing evidence that the person so charged did not contribute to the damage, contamination or pollution. PA. STAT. ANN. tit. 35, § 6021.1311.

■ Neapco argues that Degussa cannot bring a claim under the STSPA because there is no evidence that Neapco owned or operated a tank containing TCE, the "regulated substance" that is allegedly causing the contamination at the Property. (Mem. Supp. Neapco's Mot. Summ. J. at 45.)

Degussa argues that there are genuine issues of material fact regarding whether Neapco's storage tanks contained TCE solvent. (Mem. Opp'n. Neapco's Mot. Summ. J. at 22.)

Neapco concedes that Neapco owned or operated three or four steel process tanks associated with the anodizing process, which have been referred to above as the "cleaning tanks" or "cleaning tubs." (Mem. Supp. Neapco's Mot. Summ. J. at 45.) In addition, as stated above, the Court has found that there are genuine issues of material fact as whether Neapco used solvent in the cleaning tanks and whether this solvent was TCE. Moreover, Neapco has not overcome the rebuttable presumption set forth in the STSPA by clear and convincing evidence that it did not contribute to the damages, contamination, or pollution. The Court, therefore, will deny Neapco's Motion for Summary Judgment on Degussa's STSPA claim.

### 7. Liability under the PCSL

Section 401 of the PCSL provides:

It shall be unlawful for any person or municipality to put or place into any of the waters of the Commonwealth, or

allow or permit to be discharged from property owned or occupied by such person or municipality into any of the waters of the Commonwealth, any substance of any kind or character resulting in pollution as herein defined. Any such discharge is hereby declared to be a nuisance.

PA. STAT. ANN. tit. 35, § 691.401.

■ Neapco does not contest that the groundwater on the Property is contaminated with TCE. (Mem. Supp. Neapco's Mot. Summ. J. at 17.) Neapco argues, however, that Degussa cannot bring a claim under the PCSL because there is no evidence that Neapco used, stored or disposed of any of the substances that are found in the groundwater at the Property. *Id.* at 46.

Degussa argues that there are genuine issues of material fact regarding whether Neapco caused the TCE groundwater contamination. (Mem. Opp'n. Neapco's Mot. Summ. J. at 24.)

As stated above, the Court previously found that there is a genuine issue of material fact as to whether Neapco used or disposed of TCE during its tenure at the Property. The Court, therefore, will deny Neapco's Motion for Summary Judgment on Degussa's PCSL claim.

### 8. Declaratory Relief under CERCLA, the HSCA, and the STSPA

Neapco argues that Degussa cannot bring claims for declaratory relief under CERCLA, the HSCA, and the STSPA for the same reasons why Degussa cannot bring direct claims under these statutes. (Mem. Supp. Neapco's Mot. Summ. J. at 46–47.) Because the Court has concluded there are genuine issues of material fact for trial on Degussa's claims for direct relief under CERCLA, the HSCA, and the STSPA, the Court rejects Neapco's argument. Thus, the Court will deny Neapco's Motion for Summary Judgment on Degussa's claims for declaratory relief under CERCLA, the HSCA, and the STSPA.

### 9. Common Law Trespass Claim

■ Under Pennsylvania law, "one who intentionally enters land in the possession of another without a privilege to do so is liable to the possessor of the land as a trespasser." *Northeast Women's Ctr., Inc. v. McMonagle,* 670 F.Supp. 1300, 1311 (E.D.Pa.1987) (quotations omitted).

Neapco argues, assuming *arguendo* that Neapco caused the contamination at the Property, that Degussa cannot maintain a common law trespass claim because Neapco would have caused the contamination during the time Neapco owned the Property, not during Degussa's ownership of the Property. (Mem. Supp. Neapco's Mot. Summ. J. at 47.) Neapco also contends that Degussa cannot revive its fatally flawed trespass claim by arguing that the contamination at the Property constitutes a "continuing trespass." *Id.* at 48.

Degussa argues that its claim for trespass is a permanent trespass cause of action, which is recognized under Pennsylvania law and which arises when the trespass effects a permanent change in the Property, and a defendant can be held liable under a trespass cause of action for causing contamination. (Mem. Opp'n. Neapco's Mot. Summ. J. at 27.)

■ Contamination effects a permanent change in the condition of the affected property and, thus, constitutes a permanent, not continuing, trespass. *F.P. Woll & Co. v. Mitchell St. Corp.,* No. CIV. A.96–5973, 1999 WL 79059, 1999 U.S. Dist. LEXIS 894, at *31 (E.D.Pa. Feb. 4, 1999) (citing *Dombrowski v. Gould Elec., Inc.,* 954 F.Supp. 1006, 1013 (M.D.Pa.1996)). In *F.P. Woll,* the buyer of an contaminated property brought claims against the seller

under CERCLA, HSCA, STSPA, and state law claims for nuisance, negligence, and strict liability. *Id.* at *2, 1999 WL 79059. In discussing whether the buyer's state law claims were barred by the statute of limitations, Judge Waldman recognized the ability of a buyer to bring an action for permanent trespass for contamination of the subject property, but ultimately held that the buyer's state law claims were barred by the statute of limitations. *Id.* at *31–32, 1999 WL 79059.

 The Court finds that Degussa may bring a permanent trespass claim against Neapco and, therefore, will deny Neapco's Motion for Summary Judgment on Degussa's trespass claim.

### 10. Common Law Private Nuisance Claim

 Private nuisance is "a nontrespassory invasion of another's interest in the private use and enjoyment of land." *Philadelphia Elec. Co. v. Hercules,* 762 F.2d 303, 313 (3d Cir.1985), *cert. denied,* 474 U.S. 980, 106 S.Ct. 384, 88 L.Ed.2d 337 (1985). In *Hercules,* a property owner brought suit for negligence and public and private nuisance against a former owner of contaminated property. *Id.* at 306. The Third Circuit held that purchasers of real property cannot recover from the seller on a private nuisance theory for conditions existing on the land that is transferred. *Id.* at 313.

### a. Neapco's Contentions

 Neapco argues that Degussa cannot maintain a common law private nui-

sance claim because Degussa as the purchaser of real property cannot recover from Neapco for contamination that allegedly existed when the land was transferred. (Mem. Supp. Neapco's Mot. Summ. J. at 48–49.) Neapco further contends that Degussa cannot maintain a common law private nuisance claim because private nuisance claims by purchasers are barred by the doctrine of caveat emptor. *Id.* at 49.

### b. Degussa's Contentions

Degussa argues that it has a valid claim for private nuisance because the Court in *Graham Oil Co. v. BP Oil Co.,* 885 F.Supp. 716 (W.D.Pa.1994) recognized that there are exceptions that allow purchasers to recover from the seller on a private nuisance theory. (Mem. Opp'n. Neapco's Mot. Summ. J. at 27.) In *Graham,* a property owner brought an action against its tenant for alleged damages to its property caused by the tenant. *Graham,* 885 F.Supp. at 718. The Court stated:

> While it is a general rule that the law of private nuisance is designed to resolve conflicts between neighboring landlords, *see Hercules,* 762 F.2d at 314, there are exceptions to this rule. Section 821E [of the Restatement (Second) of Torts] further clarifies when an owner of a nonpossessory estate can recover in an action for private nuisance ...

*Id.* at 724.

Because Degussa is not an owner of a nonpossessory estate [6], the exception set forth in Section 821E of the Restatement (Second) of Torts is inapplicable. The

---

**6.** A possessor of land "includes not only the owners of possessory estates in fee simple absolute, but also the owners of any possessory estate." RESTATEMENT (SECOND) OF TORTS, § 821E cmt. (c) (1979). "[T]he owner of a nonpossessory estate in land has no rights or privileges in respect to the present use and

enjoyment of the land." *Id.* § 821E cmt. (f). Because Degussa is the current owner of the Property and it has rights and privileges in respect to the present use and enjoyment of the Property, the Court finds that Degussa is a possessor of land, and not the owner of a nonpossessory estate.

Court, therefore, finds that *Hercules* is controlling. Thus, Degussa, the purchaser of the Property, cannot recover from Neapco, the seller, on a private nuisance theory for conditions existing on the Property. *See Hercules,* 762 F.2d at 313. The Court, therefore, will grant Neapco's Motion for Summary Judgment on the Degussa' private nuisance claim.

### 11. Common Law Public Nuisance Claim

▆▆▆ "[A] public nuisance is 'an unreasonable interference with the right common to the general public.'" *Hercules,* 762 F.2d at 315 (citation omitted). "In order to recover damages in an individual action for a public nuisance, one must have suffered harm of a kind difference from that suffered by other members of the public exercising the right common to the general public that was the subject of interference." *Id.* at 315. Where a party simply has to remediate a contaminated property, it is specially harmed only in the exercise of its private rights. *Id.*

▆▆▆ Neapco argues that Degussa lacks standing to bring an claim for public nuisance because the harm Degussa allegedly suffered is purely private in nature and unrelated to the use of a public right. (Mem. Supp. Neapco's Mot. Summ. J. at 51.)

Degussa argues that it has a valid claim for public nuisance because Neapco's dumping of TCE solvent on the Property and contamination significantly impacts public health. (Mem. Opp'n. Neapco's Mot. Summ. J. at 26.)

This Court has recognized that violations of the STSPA and the PCSL have been declared nuisances by the Pennsylvania legislature. *Darbouze v. Chevron Corp.,* No. CIV.A.97–2970, 1998 WL 512941, 1998 U.S. Dist. LEXIS 12744, at *39 (E.D.Pa. Aug. 19, 1998) (citing Pa.

Stat. Ann. tit. 35, §§ 6020.1304, 691.401). Because the Court has previously held that there are genuine issues of material fact as to whether Neapco violated the STSPA and the PCSL, there is a genuine issue of material fact as to whether Degussa can establish a public nuisance claim. The Court, therefore, will deny Neapco's Motion for Summary Judgment on Degussa's public nuisance claim.

### 12. Pennsylvania Uniform Contribution Among Tort–Feasors Act Claim

▆▆▆ The Pennsylvania Uniform Contribution Among Tort–Feasors Act ("PUCTA") provides a right of contribution and applies if it is established that those allegedly culpable are joint tortfeasors. *Union Corp.,* 2003 U.S. Dist. LEXIS 12341, at *23–24 (citing *Rocco v. Johns–Manville Corp.,* 754 F.2d 110, 115 (3d Cir.1985)). The PUCTA defines joint tortfeasors as "two or more person jointly and severally liable in tort for the same injury to persons or property." Pa. Stat. Ann. tit. 42, § 8322.

Neapco argues that Degussa cannot maintain a claim under PUCTA because there is no evidence that Neapco is liable under any theory for the contamination at the Property and, thus, cannot be jointly and severally liable with Degussa. (Mem. Supp. Neapco's Mot. Summ. J. at 51.)

Degussa argues that it has a valid claim under PUCTA because it has valid claims against Neapco under the HSCA, STSPA, PCSL, and Pennsylvania common law. (Mem. Opp'n. Neapco's Mot. Summ. J. at 29.)

As stated above, the Court has found that there are genuine issues of material fact as to whether Neapco is liable under the HSCA, STSPA, PCSL, and public nuisance claims. Thus, the Court will deny

Neapco's Motion for Summary Judgment on Degussa's PUCTA claim.

### 13. Common Law Contribution Claim

Neapco argues that Degussa cannot maintain claims for common law contribution and indemnification because they have been preempted by CERCLA. (Mem. Supp. Neapco's Mot. Summ. J. at 52.)

The Third Circuit has held that common law claims for contribution are preempted by CERCLA. *In re Reading Co.*, 115 F.3d 1111, 1117 (3d Cir.1997). The Court, therefore, will grant Neapco's Motion for Summary Judgment on Degussa's claim for common law contribution.

### 14. Defense of Laches

#### a. Neapco's Contentions

 Neapco argues that it is entitled to summary judgment on the ground of laches. The doctrine of laches addresses inexcusable delay that results in prejudice. The elements of laches are: (1) lack of diligence by the party against whom the defense is asserted; and (2) prejudice to the party asserting the defense. *Waddell v. Small Tube Prods., Inc.*, 799 F.2d 69, 74 (3d Cir.1986) (citations omitted). Laches is an affirmative defense to a claim, and the party asserting it bears the burden of proof. *Cook v. Wikler*, 320 F.3d 431, 438 (3d Cir.2003). If a suit is brought within the statute of limitations, the equitable defense of laches is presumptively inapplicable. *Mantilla v. United States*, 302 F.3d 182, 186 (3d Cir.2002), *cert. denied,* — U.S. ——, 123 S.Ct. 1769, 155 L.Ed.2d 527 (2003) (citation omitted). With respect to CERCLA section 107(a) cost recovery actions, the majority of courts have rejected equitable defenses as inconsistent with the explicit language of CERCLA and congressional intent. *United States v. Rohm & Haas Co.*, 939 F.Supp. 1142, 1151–52 (D.N.J.1996) (citations omitted).

 Neapco contends that Degussa clearly demonstrated a lack of diligence by failing to make any further inquiry after receiving the October 24, 1988 environmental report prepared by LAN Associates ("1988 Report"), which put Degussa on notice of soil contamination as well as possible disposal of waste solvents in the backyard of the Property. (Mem. Supp. Neapco's Mot. Summ. J. at 52.) Neapco further contends that it has been prejudiced in its ability to defend itself because Degussa waited almost eleven years before making further inquiries into the environmental contamination at the Property and waited twelve years before contacting Neapco regarding its activities at the Property. *Id.* at 53.

#### b. Degussa's Contentions

Degussa argues that Neapco has not met its burden of showing inexcusable delay, let alone any delay, on the part of Degussa because Degussa did not know about any prior TCE use or disposal by anyone on the Property before 2000. (Mem. Opp'n. Neapco's Mot. Summ. J. at 29.)

The Court rejects the defense of laches with respect to Degussa's CERCLA § 107(a) cost recovery claim. *See Rohm & Haas Co.*, 939 F.Supp. at 1151–52. The equitable defense of laches is presumptively inapplicable to Degussa's other claims because this action was brought within the statute of limitations. See *Mantilla*, 302 F.3d at 186. In addition, although the 1988 Report stated that there was contamination at the Property, it is not clear in the 1998 Report whether the Property was contaminated with TCE. Thus, it cannot be said that Degussa pursued its claim with a lack of diligence. The Court, therefore,

will deny Neapco's Motion for Summary Judgment on the ground of laches.

### B. Degussa's Motion for Partial Summary Judgment

#### 1. Degussa's Contents

█ Degussa argues that Neapco is liable as a matter of law even if there are disputed factual issues regarding whether they used and disposed of TCE on the Property because there has been a release of TCE at the Property and the HSCA imposes liability on every person in the chain of title. (Mem. Supp. Degussa's Mot. Partial Summ. J. at 4.)

Degussa also argues that there was TCE contamination on the Property when it was conveyed to Degussa because the TCE contamination did not originate or migrate from an offsite source after the Property was conveyed to Degussa and Degussa did not dispose of the TCE on the Property. *Id.* at 5. Thus, Degussa concludes that the TCE must have already been present when it obtained the Property. *Id.*

#### 2. Neapco's Contentions

Neapco argues that there is no evidence that it used, stored or disposed of TCE at the Property, but there is evidence that Degussa used and disposed of TCE. (Mem. Opp'n Degussa's Mot. Partial Summ. J. at 4–6.) In support of its argument that Degussa used and disposed of TCE, Neapco relies on a Uniform Hazardous Waste Manifest Degussa submitted to the Pennsylvania Department of Environmental Resources in 1984 ("1984 Manifest"). The 1984 Manifest states that one container of chlorinated paraffin trichloroethylene was being transported from the Property. (Mem. Supp. Neapco's Mot. Summ. J. at Ex. 8.) The 1984 manifest was signed by Barry Haring, Degussa' plant manager for the Property, who testified at his deposition as follows:

Q: Can you take a moment to review [the 1984 Manifest]?

A: Uh-huh.

Q: Is that your signature that appears on this page?

A: Yes.

Q: Could you describe what that document is?

A: This is a hazardous waste manifest.

Q: Does this reflect disposal of hazardous waste from the 860 Cross Street property?

A: Yes.

Q: Does item B refer to chlorinated paraffin trichloroethylene?

A: Yes, it appears that way.

Q: Was this disposed of by Degussa with Resource Technology Services Incorporated?

A: Yes.

Q: Was this a chlorinated paraffin used by Degussa in its operations?

A: Yes.

Haring Dep. at 231–32.

Neapco also argues that Degussa cannot rely on its inventory records to support its argument that it never used TCE because there are large time gaps in the inventory records and the inventory records only catalog raw materials, in process materials, and finished goods, not ancillary compounds. (Mem. Opp'n Degussa's Mot. Partial Summ. J. at 6–7.) In addition, Neapco argues that the underlying documentation for Degussa's October 31, 1992 physical inventory report includes a handwritten card, which is labeled "2nd Count", which describes a product as "Tricloroth-ene", and which is attached to Neapco's memorandum in opposition to Degussa's Motion for Partial Summary Judgment as Exhibit A. (Mem. Opp'n Degussa's Mot. Partial Summ. J. at 6.) Neacpo refers to an

article, which is attached as Exhibit 21 to Neapco's Motion for Summary Judgment, that states that trichloroethene is a synonym for tricholoethylene and TCE.

In support of its argument that Degussa used and disposed of TCE, Neapco also relies on evidence that high concentrations of TCE and other hazardous substances are present in the surface soils above an underground storage tank that Degussa installed on the Property in approximately 1986. *Id.* at 9. Neapco further presents evidence that the distribution of the contaminants demonstrates that they were released to the land surface after the tank was installed, and evidence that the presence of high concentrations of TCE in the surface soils is consistent with more recent releases. *Id.* at 9–10.

Neapco alleges that illegal dumping has occurred at the Property since Degussa abandoned it in 1995, which may be a potential source of contamination at the Property. *Id.* at 10. Haring testified that Degussa ceased operations at the Property on December 31, 1995, and that the Property has not been fenced or guarded since that time. Haring Dep. at 250, 253. In addition, Environ, consultants hired by Neapco to perform a field investigation of the Property in connection with this litigation in December 2002, found evidence of trespassing, dumping, stained soils, chemical spillage and soil contamination on the Property. (Mem. Opp'n Degussa's Mot. Partial Summ. J. at 10–11.)

Finally, Neapco presents the opinion of its expert that an offsite source of the contamination cannot be ruled out. *Id.* at 11.

Under the same legal principles discussed above, see § III(A)(2), the evidence presented by Neapco creates a genuine issue of material fact as to whether Degussa used or disposed of TCE. The Court, therefore, will deny Degussa's Motion for Partial Summary Judgment.

## IV. Conclusion

For the reasons set forth above, the Court will deny Degussa's Motion for Partial Summary Judgment and will grant in part and deny in part Neapco's Motion for Summary Judgment. The only claims for which the Court is granting Neapco's Motion for Summary Judgment are Degussa's private nuisance and common law contribution claims.

An appropriate Order follows.

### *ORDER*

AND NOW, this ___ day of August, 2003, upon consideration of Plaintiff's Motion for Partial Summary Judgment (Docket No. 13) and Defendants' Motion for Summary Judgment (Docket No. 14), and the responses thereto, it is hereby ORDERED that Plaintiff's Motion for Partial Summary Judgment is DENIED and Defendants' Motion for Summary Judgment is granted in favor of Defendants with respect to Plaintiff's private nuisance and common law contribution claims, but is otherwise denied.